UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **JENNIFER WOLFE, Individually and on behalf of the FJ Management Inc, 401k Plan, and on behalf of all the similarly situated participants and beneficiaries of the plan,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**FJ MANAGEMENT INC.,**<br><br>**Defendant.** | **Case No. 1:26-cv-10954**<br><br>**JURY TRIAL DEMANDED** |

## AMENDED CLASS ACTION COMPLAINT

1. Plaintiff Jennifer Wolfe ("Plaintiff"), individually, and on behalf of all other similarly situated participants, their beneficiaries and estates, and on behalf of FJ Management Inc. 401(k) Plan ("the Plan"), brings this action under 29 U.S.C. §§ 1132(a)(2) and (3) against Defendant FJ Management Inc. (the "Company", or "Defendant"), to remedy Defendant's breaches of fiduciary duties and other violations of the Employee Retirement Income Security Act of 1974, as amended (ERISA), 29 U.S.C. § 1001, *et seq*.

2. Defined contribution plans that are qualified as tax-deferred vehicles have become the primary form of retirement savings in the United States and, as a result, America's *de facto* retirement system. Unlike traditional defined benefit retirement plans, in which the employer typically promises a calculable benefit and assumes the risk with respect to high fees or underperformance of pension plan assets used to fund defined benefits, defined contribution plans operate in a manner by which participants bear the risk of high fees and investment underperformance.

3. As a fiduciary to the Plan, at all times relevant to this Complaint Defendant was obligated to act (1) prudently and (2) for the exclusive benefit of participants and beneficiaries. Defendant violated its fiduciary duties by both (1) initially selecting; and (2) consistently retaining the American Century Target Date Fund for more than eight years, even when it glaringly underperformed under all investment metrics and, consequently, in terms of returns. This lower-performing investment option reduced Plan participants' retirement funds by millions of dollars as compared to if Defendant did not breach its fiduciary duties.

4. Additionally, despite its fiduciary obligations to follow the governing Plan documents, Defendant failed to allocate Plan assets (forfeitures) as instructed by the Plan. Specifically, despite the Plan documents' instruction that, if any forfeitures remained after restoring previously forfeited amounts to participants' accounts, "[a]ny remaining forfeitures will be…[u]sed first to offset Plan expenses", upon information and belief Defendant chose to apply nearly $1.5 million of Plan forfeitures to offset employer contributions between 2020 and 2024, while using none to defray the nearly $2.5 million of Plan expenses. Defendant's failure to follow the prioritization for use of forfeitures set forth in the Plan resulted in Plan participants paying expenses the Plan promised to pay, reducing Plan participants' retirement funds.

5. Plaintiff brings this action to obtain the relief provided under 29 U.S.C. § 1109, for losses suffered by the Plan resulting from the Defendant's fiduciary breaches described below, and for other appropriate equitable and injunctive relief under 29 U.S.C. § 1132(a)(3).

## I. JURISDICTION AND VENUE

6. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 1132(e)(2).

7. Venue was proper in this judicial district at the time the initial complaint was filed under 29 U.S.C. § 1132(e)(2). However, by filing this Amended Class Action Complaint, Plaintiff has removed all defendants other than the Company. In light of this amendment, the parties will promptly file a stipulation to transfer this action to the United States District Court for the District of Utah pursuant to 28 U.S.C. §1404, as venue is now proper in that judicial district pursuant to 29 U.S.C. § 1132(e)(2).

## II. THE PARTIES

8. At relevant times, Plaintiff by virtue of Plaintiff's former employment with the Company and participation in the Plan, is or may become eligible to receive additional benefits under the Plan as a result of Defendant's breaches of fiduciary duty and ERISA violations.

9. Thus, Plaintiff is a participant as defined by ERISA § 3(7), 29 U.S.C. § 1002(7).

10. At relevant times during the Class Period, Plaintiff was invested in the American Century One Choice target date fund series.

11. As a result of the Defendant's mismanagement of the Plan and violations of ERISA, and in particular Defendant's inclusion of the American Century One Choice target date fund series, Plaintiff was subject to underperformance and suffered financial losses.

12. At all relevant times, the Company was and is incorporated in Utah with its principal office located at 158 S. State Street, Suite 1300, Salt Lake City, Utah. The Company has over 10,000 employees.

13. At all relevant times the Company was and is the named fiduciary and sponsor of the Plan per 29 U.S.C. § 1002(16)(B) and 29 U.S.C. § 1002(a); a party in interest under 29 U.S.C. § 1002(14)(C); and a Plan fiduciary under 29 U.S.C. § 1002(21)(A), to the extent it exercised discretion over the administration and management of the Plan and/or control of Plan assets.

## III. THE PLAN

14. The Plan is an "employee pension benefit plan" within the meaning of 29 U.S.C. § 1002(2)(A), a "defined contribution plan" within the meaning of 29 U.S.C. § 1002(34), and a qualified plan under 26 U.S.C. § 401(k).

15. The Plan was established to provide eligible employees with the opportunity to accumulate retirement savings over a long period through the sum of employee and employer contributions and associated investment earnings minus associated expenses.

16. The Plan is a defined contribution plan covering all eligible employees of FJ Management Inc. and participating subsidiaries. Participants of the Plan can elect to make tax-deferred contributions upon eligibility.

17. Defendant controls and manages the operation and administration of the Plan. Defendant has fiduciary responsibility for the investment of the assets of the Plan.

18. The Plan is subject to the provisions of the Employee Retirement Income Security Act of 1974 (ERISA).

19. According to commonly accepted industry sizing frameworks for defined contribution plans, from the beginning of the Class Period[1] to 2023 the Plan was considered a mid-sized plan with total plan assets ranging between $120 million and $166 million. As of the end of 2024, however, the Plan had grown, and was considered a large Plan, larger than 99% of all defined contribution plans. As of the end of 2024, Defendant managed over $278 million in Plan assets in 2024 for 15,237 active participants.

20. Upon information and belief, in light of the large size of the Plan and the vast resources of Defendant, at all times relevant to the Class Period, the Plan had access to a wide

---

[1] As used herein, "Class Period" refers to the six years prior to the filing of this complaint.

array of plan investment options and Defendant had the ability to investigate and monitor the Plan's investments.

21. From at least the start of the Class Period through the end of the first quarter of 2025, the Plan offered the American Century One Choice target date fund series—formerly named the American Century Retirement Date target date fund series before its rebranding (collectively, the "AC TDF series" or "AC TDF")—as the Plan's qualified default investment alternative under 29 C.F.R. § 2550.404c-5. The Plan offered each AC TDF vintage from "In Retirement" through 2065, and each Plan participant was allocated to the AC TDF vintage corresponding to his or her anticipated retirement date.

22. Throughout the Class Period, the AC TDF series was by far the dominant investment option in the Plan. According to the Plan's Form 5500s, the AC TDF series held the following portion of the Plan's total assets at the close of each year.

| **Plan Year** | **AC TDF Assets** | **Total Plan Assets** | **AC TDF % of Plan** |
|---|---:|---:|---:|
| 2020 | $78,184,775 | $119,610,310 | 65.4% |
| 2024 | $184,693,722 | $278,629,616 | 66.3% |

The AC TDF series was thus, throughout the Class Period, the largest single investment on the Plan's books—far larger than any other investment option, and representing approximately two-thirds of every dollar invested in the Plan by the Plan participants.

23. In or about the first quarter of 2025, Defendant replaced the AC TDF series with the Nuveen Lifecycle Index Funds (formerly known as the TIAA-CREF Lifecycle Index Funds prior to the May 2024 rebranding). On information and belief, Defendant implemented that replacement on a vintage-for-vintage, in-place basis, mapping each AC TDF vintage to the corresponding Nuveen Lifecycle Index vintage in identical-dollar fashion, without participant election.

24. The Nuveen Lifecycle Index Funds carry materially different label-categorizations from the AC TDF series. Whereas the AC TDF series is an actively managed "to-retirement" series—with a glide path that flattens at retirement to a terminal equity allocation of approximately 45%—the Nuveen Lifecycle Index Funds are passively managed "through-retirement" funds that follow a 95/50/20 glide path: a 95% equity allocation at 45 years to retirement, declining to a 50% equity/50% fixed income mix at retirement, and continuing to decline to a 20% terminal equity allocation 30 years past the retirement date. The Nuveen Lifecycle Index Funds invest passively in underlying index funds tracking the Russell 3000 Index (U.S. equities), the MSCI EAFE + Emerging Markets Index (non-U.S. equities), and the Bloomberg U.S. Aggregate Bond Index (fixed income).[2]

## IV. DEFENDANT'S FIDUCIARY OBLIGATIONS

25. ERISA imposes strict fiduciary duties upon the Defendant as a fiduciary of the Plan, including the duty of prudence. These duties apply to all fiduciary acts, including the Defendant's selection and retention of investment options for the Plan.

26. ERISA's duty of prudence requires fiduciaries to discharge their responsibilities "with the care, skill, prudence, and diligence" that a prudent person "acting in a like capacity and familiar with such matters would use." 29 U.S.C. §1104(a)(1)(B).

27. ERISA also requires fiduciaries to act "in accordance with the documents and instruments governing the plan[.]" 29 U.S.C. §§ 1104(a)(1)(D).

28. As part of its fiduciary duty, the Defendant "ha[s] a continuing duty to monitor [Plan] investments and remove imprudent ones" that exists "separate and apart from the [fiduciary's] duty to exercise prudence in selecting investments." *Tibble v. Edison Int'l*, 575 U.S.

2 *See* Nuveen, Nuveen Lifecycle Index Funds At-a-Glance, at 2-4 (2024) (showing glide-path table, underlying index assignments, and rebranding from TIAA-CREF Lifecycle Index Funds effective May 1, 2024).

523, 529 (2015). "A plaintiff may allege that a fiduciary breached the duty of prudence by failing to properly monitor investments and remove imprudent ones." *Id.* at 530. If an investment is imprudent, Defendant "must dispose of it within a reasonable time." *Id.* (citation omitted).

29. Under 29 U.S.C. § 1132(a)(2), a plan participant is authorized to bring a civil action to enforce a breaching fiduciary's liability to the plan under 29 U.S.C. § 1109.

## V. FACTUAL ALLEGATIONS

### A. Defendant violated ERISA's fiduciary duty of prudence by selecting and retaining the American Century Target Date Funds.

30. The circumstances of Defendant's breaches with respect to the AC TDFs are straightforward. The AC TDFs dominated the Plan throughout the Class Period; prudent fiduciaries had readily available industry-leading TDF comparators against which to evaluate them; those comparators showed by 2020 that the AC TDFs were persistently inferior under MPT metrics, including risk adjusted analysis, manager performance, cost, and returns; and Defendant nevertheless retained the AC TDFs for years until replacing them in 2025.

#### 1. Background on target date funds

31. In a recent report to Congress, the U.S. Government Accountability Office ("GAO") noted that Target date funds (TDFs) are widely offered and have become the most popular investment option used by 401(k) plan participants.[3] TDFs allocate assets over time based on participants' targeted retirement dates. Plan sponsors often choose TDFs as their default investment because TDFs offer a "set it and forget it" option for participants.

32. The investment objective of a target date fund series is to provide an asset allocation strategy that changes its asset allocation over time as investors get closer to their expected

[3] Government Accountability Office, *GAO-24-105364, 401(k) Retirement Plans – The Department of Labor Should Update Guidance on Target Date Funds* (March 2024), https://www.gao.gov/assets/870/868017.pdf (last accessed February 19, 2026).

retirement date. The name of each fund in a target date series typically refers to its target date, which corresponds approximately to the investor's anticipated retirement date. For example, a fund with a name like "Retirement Fund 2040" or "Target 2040" is designed for individuals who intend to retire in or near the year 2040. Target retirement years are often offered in five-year increments. The specific retirement date of a fund in a target date series is often referred to as a "vintage." For example, funds in a target date fund series for plan participants expected to retire around 2040 would typically be referred to as the 2040 vintage of that series while the fund in a target date fund series for plan participants expected to retire around 2030 would typically be referred to as the 2030 vintage target for that specific target date fund series.

33. American Century Investments ("AC") is an investment management company that created and manages the American Century One Choice target date fund series (hereafter "AC TDF"). Like most target-date fund series, the AC TDF is structured as a "fund of funds," which means that each vintage invests in other American Century proprietary funds rather than individual securities. For example, each vintage in the AC TDF may be invested in differing proportions of proprietary AC equity funds, bond funds, real estate funds, and money market funds. In other words, each vintage of the AC TDF invests in a combination of proprietary AC mutual funds to provide varying exposure to a mix of asset classes such as U.S. stocks (large-caps and small-caps), international stocks, U.S. bonds, international bonds, investments linked to real estate, and cash-equivalent securities. These asset classes can be further categorized generally as allocations to equities or as allocations for fixed income.

34. Each equity allocation is intended to provide exposure to a specific market segment. Typically, those segments include U.S. large-, mid- and small-capitalization companies and international (non-U.S.) developed and emerging markets. The portfolio manager's aim should be

to build a portfolio that provides exposure to factors commonly tied to a stock's potential for enhanced risk-adjusted returns relative to the market.

35. Each fixed income allocation is intended to provide diversified exposure across a wide range of market sectors, including U.S. government obligations, corporate investment grade and below investment grade bonds (commonly known as "high yield bonds" or "junk bonds"), other U.S. aggregate bond sectors (including mortgage- and asset backed securities), and emerging market and international fixed income issues. The portfolio manager's aim is to provide broadly diversified fixed income exposure and construct a portfolio to enhance issuer diversification and liquidity.

36. Under ERISA, the asset allocation for each vintage of a target date fund series is required to be consistent with the prudent investor standard which incorporates Modern Portfolio Theory ("MPT").

37. TDFs seek to achieve their objectives by rebalancing assets over time to become less focused on growth (lowering their allocation to stocks) and more focused on preservation (raising their allocation to bonds) as the fund approaches and passes the target date. The asset mix between equity and fixed income shifts dynamically over time, becoming less risky over a person's working career and into retirement. The transition from higher risk to lower risk is often referred to as the "glide path."

38. For example, Figure 1 below illustrates Morningstar's calculation of the average glide path over time from 2010 to 2024.

**Figure 1**




[4]

39. TDF glide paths are often categorized as managed either “to” or “through” retirement. In general, historically a “to retirement” glide path generally assumed participants withdraw their funds once they reach the presumed retirement age, or soon thereafter, and tend to have less equity exposure at retirement. Similarly, in general, the asset allocation of a “to retirement” TDF historically remained static once the retirement date is reached. A “through retirement” glide path generally expects participants will remain invested after reaching retirement and gradually draw down on their funds. Accordingly, the terminal allocation of a “through retirement” TDF is not reached until a predetermined number of years after the target date.

[4] Morningstar 2025 Target-Date Fund Landscape, April 2025, page 24.

40. However, these distinctions and categorizations are somewhat arbitrary. In reality, Morningstar has found that "in practice, there doesn't appear to be a large difference in how investors use the different glide-paths."[5] In fact, for example, some "to retirement" glide paths, like the AC TDF series, have more or similar equity exposure at retirement than some "through retirement" glide paths.

41. Moreover, as illustrated in Figure 1 above, over time most retirement plan asset managers have understood that, under the circumstances prevailing prior to and at the start of the Class Period as well as now, static asset allocations for plan participants around age 65 are less consistent with Modern Portfolio Theory.

42. Further, while TDFs are sometimes considered differentiated by whether they consist of index (passive) funds or active funds, in fact all TDFs are actively managed at the asset-allocation level—through the continuous rebalancing of each vintage along the glide path. The "passive" or "active" label refers to the underlying fund layer, not to the asset-allocation decisions that drive a TDF's risk and return. Examining a glide path therefore says little about the actual quality of a series' risk-reducing mechanism; rigorous MPT analysis is required for any meaningful assessment of risk.

43. Accordingly, as described below in more detail, the minimum standard of care for prudent plan fiduciaries making investment decisions under the prudent investor standard requires a fiduciary to consider investment options other than only a small subset of the available options when selecting or monitoring a target date fund series.

44. Additionally, while the specific details of glide paths vary somewhat across different TDF series, they are all constrained by Modern Portfolio Theory and, as a result, they all

[5] Pacholok & Zaya, 2022 Target-Date Strategy Landscape, Morningstar Manager Research, at 37 (Mar. 23, 2022).

compete with each other for investment dollars. Over the years, it has become clear that some glide paths are better than others. This is illustrated by the change in the average glide path illustrated above as well as net fund flows out of inferior glide paths and into superior glide paths.

45. Further, because most plan fiduciaries designate the selected TDF as the qualified default investment alternative ("QDIA") under ERISA, the TDF selected by a plan fiduciary will typically contain the lion's share of the assets of most plan participants. For this reason, the selection of a TDF series as the QDIA by a plan fiduciary is often the most important and impactful of all its investment selection and monitoring responsibilities.

46. Unlike most of the equity and fixed income asset categories that comprise the underlying investments contained in TDFs for which there are often several scores of alternatives, there are far fewer TDF options. For example, in 2024, there were only 37 established TDFs that had a 15-year track record. A closer look reveals that, as shown in Figure 2 below, assets are highly concentrated in the top 5 largest TDFs, which accounted for 80% of all TDF-invested dollars as of 2024, and that among these top 5, the Vanguard TDF series contains more than double the assets of the next largest TDF series.

**Figure 2**




[6]

47. The same was true at the beginning of the class period in 2020 with the Vanguard, T. Rowe Price, BlackRock, and Capital Group comparators in this action harboring 65% of the TDF market invested money through the class period.

[6] Morningstar 2025 Target-Date Fund Landscape, April 2025, page 13.

**Figure 3**

**Exhibit 13** The 10 Largest Target-Date Providers

| | | Assets (USD in Billions) | | | Market Share | |
|---|---|---|---|---|---|---|
| Firm | Target-Date Series | Mutual Fund | CIT | Total TDF | 2021 | 2020 |
| **Vanguard** | | | | 1,190 | 36.4% | 36.7% |
| | Vanguard Target Retirement | 660 | 530 | | | |
| **Fidelity** | | | | 460 | 14.1% | 13.3% |
| | Fidelity Freedom | 221 | — | | | |
| | Fidelity Freedom Index | 106 | 46 | | | |
| | Fidelity Freedom Blend | 11 | 55 | | | |
| | Fidelity Advisory Freedom | 21 | — | | | |
| | Fidelity Flex Freedom Blend | <1 | — | | | |
| | Fideity Managed Retirement | <1 | — | | | |
| **T. Rowe Price** | | | | 374 | 11.5% | 11.6% |
| | T. Rowe Price Retirement | 180 | 170 | | | |
| | T. Rowe Price Target | 4 | 1 | | | |
| | T. Rowe Price Retirement Hybrid | — | 16 | | | |
| | T. Rowe Price Retirement Blend | <1 | 4 | | | |
| **BlackRock** | | | | 289 | 8.8% | 9.5% |
| | BlackRock LifePath Index | 61 | 226 | | | |
| | BlackRock LifePath Dynamic | 1 | 1 | | | |
| | BlackRock LifePath ESG Index | <1 | — | | | |
| **American Funds** | | | | 248 | 7.6% | 7.2% |
| | American Funds Target Date Retirement | 239 | 9 | | | |

48. The significant market share among TDF market leaders is primarily the result of investors moving away from clearly inferior TDF products, like the AC TDF chosen by Defendant in this case, and into superior alternatives.

49. As noted above, all TDFs compete for selection by plan fiduciaries and are compared against each other despite some slight differences in glide paths. Unlike the mutual fund market, the TDF market is too small and concentrated for plan fiduciaries to fail to compare their selected options against the market leading and established available options. In other words, while there are some differences between, *e.g.*, the T. Rowe Price and Vanguard TDFs, prudent fiduciaries compare and consider these two as well as other options when making their selections

and deciding whether to retain or remove a selected TDF series. Further, over time as prudent fiduciaries have continued to evaluate and analyze the differences in the glide paths of each TDF series, the superior glide paths have attracted more assets and most TDFs with underperforming glide paths have revised their glide paths to be more like the superior options. In other words, over time the variance between the glide paths of the TDF series have decreased and those that continue to be outliers have experienced underperformance.

### 2. The standard of care for prudent fiduciaries selecting and retaining a TDF Series

50. ERISA's fiduciary duty of prudence requires that fiduciaries must act in accordance with the prudent investor standard when making decisions related to plan investments. This means that in order to be prudent, fiduciaries are required to follow accepted investment theories and prevailing investment industry practices. *Tibble v. Edison Int'l*, 575 U.S. 523, 529-30 (2015). For the last several decades, the most accepted investment theory is MPT, which has been incorporated into the prudent investor standard.

51. A prudent TDF selection and monitoring process considers a wide array of metrics commonly accepted and incorporated in MPT that allow the fiduciary to properly assess the prudence of any potential TDF series.

52. A prudent process considers all the metrics and circumstances present at the time of the selection/retention/removal decision in order to evaluate whether the TDF should be selected or retained.

53. Accordingly, the minimum standard of care for prudent plan fiduciaries selecting and retaining investment options to be made available for plan participants always requires an analysis of the risk-adjusted performance of the selected or retained investment options.

54. While the selection of a target date series is a bit more complex than the selection of a single-strategy investment option, retirement plan experts have also developed a minimum standard of care with respect to the selection and retention of target date series.

55. The most critical criteria for selecting and retaining target date fund series are performance, risk (which incorporates risk-adjusted performance), fees, and the "glide path" dynamic asset allocation (also sometimes called "portfolio construction"). These quantitative criteria are also supplemented with some qualitative criteria that are often merely proxies for an increased risk of future underperformance, *e.g.*, a change in the investment manager's ownership or key personnel, a shift in the investment manager's philosophy or process, or the investment manager's involvement in litigation or fraud allegations.[7]

56. In other words, the qualitative criteria primarily provide reasons to not select (or eliminate) a TDF series from a plan even if performance was good at that moment. At the end of the day, however, risk-adjusted performance is the primary and most important criteria. Even the fees are essentially a proxy for performance because lower fees correlate with higher performance.

57. And of course, the actual performance of an investment is the most important criteria to the investor (plan participant) and is accordingly always considered when evaluating a target date series. And because each target date series might incorporate a glide-path that takes on relatively more (or less) risk, the risk-adjusted performance metrics are relatively more important for comparing and benchmarking target date series.

[7] *See* Government Accountability Office, *GAO-24-105364, 401(k) Retirement Plans – The Department of Labor Should Update Guidance on Target Date Funds* (March 2024), p. 50, https://www.gao.gov/assets/870/868017.pdf (last accessed May 1, 2026); *See also* CAPTRUST's "Best Practices for Target Date Fund Selection, https://www.captrust.com/wp-content/uploads/2019/05/tdftips.pdf (last accessed January 20, 2026); Callan Institute, Defined Contribution Trends Surveys 2017-2020, 2022.

58. As discussed above, when evaluating the risk-adjusted performance and quality of investment managers, the minimum standard of care for prudent plan fiduciaries incorporates standard metrics from MPT. The most important of these criteria include, but are not limited to, the following metrics over three- and five-year trailing periods:

- Alpha: A measure of the difference between a portfolio's actual returns and its expected performance, given its level of risk as measured by beta. A positive Alpha indicates the portfolio has performed better than its beta would predict. In contrast, a negative Alpha indicates the portfolio has underperformed, given the expectation established by beta.[8]
- Sharpe Ratio: A risk-adjusted returns measure developed by William Sharpe. The Sharpe Ratio is calculated over each time period by dividing a fund's annualized excess returns by the standard deviation of a fund's annualized excess returns to determine reward per unit of risk. The Sharpe Ratio can be used to compare two funds directly on how much risk each had to bear to earn excess return over the risk-free rate.[9] Notably, American Century identifies the Sharpe Ratio is a meaningful investment metric in its marketing materials. *See* https://www.americancentury.com/advisors/client-conversations/target-date-solutions/one-choice-target-date-portfolios/ (last accessed February 20, 2026) ("Portfolios with higher Sharpe Ratios tend to provide more return for the same amount of risk as portfolios with lower Sharpe Ratios").

---

[8] *See* Government Accountability Office, *GAO-24-105364, 401(k) Retirement Plans – The Department of Labor Should Update Guidance on Target Date Funds* (March 2024), p. 70-1, https://www.gao.gov/assets/870/868017.pdf (last accessed May 1, 2026)

[9] *See id.* at 71.

- Sortino Ratio: Similar to the Sharpe ratio, the Sortino Ratio (developed by Frank Sortino) uses only the downside risk portion of the standard deviation in the denominator.[10]

59. Some other relevant metrics include the following:

- Information ratio ("IR"): a metric that helps the investor evaluate whether the manager of the investment is beating a specific benchmark. An IR above 1.0 is evidence of excellent performance with consistent outperformance of the specific benchmark; an IR between 0.5 and 0.99 is evidence of reasonable manager skill; an IR of below 0.5 is evidence of weak performance as compared to the specific benchmark; and a negative value IR is evidence of consistent underperformance relative to the benchmark.
- Batting Average ("BA"): is a measure of a manager's ability to consistently beat the market. It is calculated by dividing the number of months in which the manager beat or matched the fund's primary benchmark index by the total number of months in the period. For example, a manager who meets or outperforms the market every month in a given period would have a batting average of 1.000. A manager who beats the market half of the time would have a batting average of .500.
- Turnover Ratio: is the percentage of a mutual fund or other portfolio holdings that have been replaced in the course of one year. Since a fund with a higher turnover ratio will have higher trading fees and short-term capital gains taxes,

---

[10] Government Accountability Office, *GAO-24-105364, 401(k) Retirement Plans – The Department of Labor Should Update Guidance on Target Date Funds* (March 2024), p.71, https://www.gao.gov/assets/870/868017.pdf (last accessed May 1, 2026).

a portfolio manager with a higher turnover ratio will need to ensure that those trades are generating positive returns in excess of the additional costs.

60. Additionally, the minimum standard of care for prudent plan fiduciaries selecting and retaining a TDF series requires a comparison of the risk-adjusted performance because no target date series will have an identical glidepath compared to its meaningful comparators.[11] In other words, to satisfy the minimum standard of care under the circumstances then prevailing both prior to and throughout the Class Period, a prudent fiduciary should have considered a comparison of the risk adjusted returns of available peer alternatives.[12]

61. Accordingly, a prudent plan fiduciary, when determining whether to retain a Target Date Fund series, would evaluate and compare the performance and commonly accepted investment performance metrics such as the ones identified above to meaningful benchmarks including at the very minimum the industry leading peer alternative target date options.

62. Prior to and throughout the Class Period prudent plan fiduciaries had access to a tremendous amount of information to evaluate the performance of the AC TDF series in comparison to the industry leading alternative options.

63. Additionally, the prudent evaluation process requires an evaluation of all various "preferences" with respect to various target date fund series. In other words, the selection of a "through" versus a "to" TDF series or an "active" versus a "passive" TDF series is a fiduciary decision in and of itself. Similarly, the selection of a TDF series incorporates and requires the

[11] *See* 29 C.F.R. §2550.404a-1 ("Investment Prudence Duties" shall include is not necessarily limited to "[a] determination by the fiduciary that the particular investment or investment course of action is reasonably designed, as part of the portfolio (or, where applicable, that portion of the plan portfolio with respect to which the fiduciary has investment duties) or menu, to further the purposes of the plan, taking into consideration the risk of loss and the opportunity for gain (or other return) associated with the investment or investment course of action compared to the opportunity for gain (or other return) associated with reasonably available alternatives with similar risks.")

[12] *See*, the Target Date Benchmarking section of the Callan Institute, Defined Contribution Trends Surveys 2017-2020, 2022.

selection of the glide path of that TDF series which is also a separate fiduciary decision in and of itself. Arbitrary limitation to only consider "to" or "through" options, or only "active" and not "passive" is imprudent.

64. For instance, hypothetically, if all "passive" TDF series consistently underperformed all "active" TDF series then it would be imprudent to limit the selection process to "passive" options because there may be something inherently imprudent in the universe of "passive" options. The same goes for choosing a "to" TDF series versus a "through" series. Moreover, there is a lot of overlap in the glide paths of "to" versus "through" glide paths and since many of the categorizations are arbitrary, a prudent fiduciary would consider the entire universe of TDFs as opposed to a limited subset.

65. Accordingly, a prudent plan fiduciary is required to evaluate not only whether a particular preference is prudent under the circumstances then prevailing but also whether specific options that incorporate or do not incorporate those preferences are prudent. In other words, a prudent plan fiduciary would be required to conduct an evaluation of the differences between various preferences to determine and ensure that those preferences were, in fact, prudent.

66. Accordingly, it makes sense that the minimum standard of care for investment experts and prudent plan fiduciaries prior to and throughout the class period when monitoring a target date series is to evaluate and compare the MPT investment metrics to all types of target date series. In other words, the minimum standard of care in actual practice prior to and throughout the class period is to evaluate and compare all "Active" and Passive" and "To" and "Through" series and all of these are potential substitutes regardless of the use of any of these labels.

67. For example, as set forth below in Figure 4, prior to and throughout the class period several plan fiduciaries who had previously selected the AC TDF series determined that it was no

longer prudent and removed the AC TDF series labeled "Active"/"To" and replaced them with a wide array of TDFs carrying other labels—"Active"/"Through," "Passive"/"Through," and "Passive"/"To", **most of which switched to the comparator TDFs identified in this Complaint**, e.g., the American Funds Target Date Series (Active/Through) and the Vanguard Target Retirement Series (Passive/Through).

**Figure 4**

**Plans That Removed AC TDFs (Active; To) in Favor of Other Options**

| Plan Name | Replaced With | Year of Change |
|---|---|---|
| LHC Group 401(k) Plan | BlackRock LifePath Index **(Passive; To)** | 2019 |
| IBEW Local Union No. 252 Def Contrib Plan 401K Plan | American Funds Target Date Funds **(Active; Through)** | 2019 |
| ADAMS KEEGAN RETIREMENT SAVINGS PLAN | John Hancock Lifetime Blend **(Active/Passive Blend; Through)** | 2020 |
| ECS Federal, LLC 401(k) Plan | Vanguard Target Retirement Funds **(Passive; Through)** | 2020 |
| Opko Health, Inc. 401(k) Plan | Vanguard Target Retirement Funds **(Passive; Through)** | 2020 |
| Quinn Emanuel Urquhart & Sullivan, LLP 401(k) Plan | American Funds Target Date Funds **(Active; Through)** | 2021 |
| Mccormick Barstow 401(k) Retirement Plan | American Funds Target Date Funds **(Active; Through)** | 2021 |
| The Marvin Companies Profit Sharing and 401(k) Plan | American Funds Target Date Funds **(Active; Through)** | 2024 |
| Midmark Corporation 401(k) Savings Plan | T. Rowe Price Retirement Funds **(Active; Through)** | 2024 |
| Maher Terminals LLC Profit Sharing and 401(k) Plan | Vanguard Target Retirement Funds **(Passive; Through)** | 2024 |
| Digi-Key Corporation 401(k) Profit Sharing Plan | MercerWise Target Date Trusts **(Active; Through)** | 2024 |

### 3. The AC TDFs are properly compared to industry-leading TDF alternatives

68. Practically speaking, prior to and throughout the Class Period, in the TDF market with limited options, a prudent plan fiduciary would always consider and compare, at a minimum, the Capital Group Target Retirement Series (also known as "American Funds"), the Vanguard Target Retirement Series, the T. Rowe Price Target Series[13], and the BlackRock LifePath Index series with any other potential TDF series because these have consistently outperformed most alternatives when evaluated by the prudent MPT process and are accordingly among the most often selected TDF options.

69. The "to" or "through" label does not, by itself, indicate substantial differences in real-world metrics, aims, risks, or rewards between the "to" and "through" paths. The AC TDF has no meaningful differences from the leading TDF options that would render it incomparable for purposes of evaluating its prudence. In practice, these labels are imprecise, if not arbitrary, and carry little weight when measured against actual MPT metrics for risk and return. Defendant's own conduct confirms as much: in 2025, Defendant removed the "**active," "to-retirement"** AC TDF and replaced it, on a vintage-for-vintage in-place basis, with the Nuveen TIAA Lifecycle Index Class J,[14] **a "passive," "through-retirement"** series. *See supra* ¶¶ 25-26. By doing so, Defendant demonstrated that in practice the label categories do not control the comparator analysis. Thus, it is not surprising that numerous Plans that held the poorly performing AC TDFs moved to these options regardless of label conformity as demonstrated in Figure 4.

---

[13] Note that T. Rowe Price has a few different versions of their TDFs with minor variations on the glide path and amount of equity at retirement and the portion of "active" versus "passive investment options in the underlying mutual funds. For purposes of detailed MPT metric comparisons, we are using the T. Rowe Price Target Series because its glidepath is closer to the AC TDF glidepath. In comparisons to the T. Rowe Price Retirement Series, the AC TDFs would look similarly inferior. Moreover, as described below, the minimum standard of care for prudent plan fiduciaries would require evaluating all the TDF options as potential substitutes.

[14] Nuveen carries a 95% equity allocation at its most aggressive, youngest, vintage and 50% equity allocation at 0 years to retirement. This again demonstrates that in reality, at least 5% to 15% changes in allocation are acceptable in comparisons and changes in fiduciary decisions.

70. Further, Defendant's eventual and late recognition of the AC TDF's imprudence does not, however, cure the years of imprudent retention that preceded it; ERISA's continuing duty to monitor obligated Defendant to remove the AC TDF years before it did. *Tibble v. Edison Int'l*, 575 U.S. 523, 530 (2015).

71. The AC TDF is and was not a conservative option that offered any meaningful protection against sell off markets—which is even more apparent below when properly applying MPT metrics that adjust for risk and examine manager performance and more.

72. The figure below reports each series' equity allocation at the target retirement date and total return during the COVID-driven market sell-off in the first quarter of 2020.

**Figure 5**
**Equity Allocation at Retirement and Q1 2020 Performance for the Five Largest "To" and "Through" Target-Date Series**

In 2020's first quarter, for instance, the median 2020 "through" vintage lost 10.7% versus 7.6% for its "to" counterpart. Exhibit 38 shows the target equity allocation at retirement and the performance of the five largest "through" and "to" series during the selloff.

**Exhibit 38** To vs. Through Performance During 2020's First Quarter

| Glide Path Type | Series | Equity Allocation at Retirement (%) | Return Q1 2020 (%) |
|---|---|---|---|
| **Through** | Vanguard Target Retirement | 50 | -10.74 |
| | Fidelity Freedom | 52 | -12.34 |
| | American Funds Target Date Retirement | 46 | -8.85 |
| | T. Rowe Price Retirement | 55 | -14.21 |
| | Fidelity Freedom Index | 52 | -10.06 |
| | **Median** | **52** | **-10.74** |
| **To** | BlackRock LifePath Index | 40 | -7.59 |
| | American Century One Choice | 45 | -10.15 |
| | JPMorgan SmartRetirement | 31 | -9.40 |
| | Voya Index Solution | 35 | -5.22 |
| | USAA Target Retirement | 35 | -7.60 |
| | **Median** | **35** | **-7.60** |

Source: Morningstar Direct. Data as of Dec. 31, 2021.

73. The four comparators pleaded below are all included in Figure 4 and each is a meaningful benchmark for the AC TDFs.

74. First, the Capital Group/American Funds Target Date Retirement Series ("American Funds TDF") is, like the AC TDF, an actively managed, fund-of-funds series classified by Morningstar in the same vintage-specific Target-Date 20XX Categories that align vintage-for-vintage with the AC TDF series.[15] Notwithstanding the "through-retirement" label carried by the American Funds TDF, the American Funds TDF and the AC TDFs share materially similar risk and asset-allocation characteristics at the time of greatest fiduciary concern—the date of retirement. According to Morningstar's *2022 Target-Date Strategy Landscape*, the American Funds TDF held a 46% equity allocation at retirement, while the AC TDF held a 45% equity allocation at retirement—a difference of one percentage point.

75. Second, the Vanguard Target Retirement Series ("Vanguard TDF") is the largest TDF series in the United States by assets under management, used by tens of thousands of ERISA plans, and classified by Morningstar in the same vintage-specific Target-Date 20XX Categories as the AC TDFs. At retirement, the Vanguard TDF with its "through-retirement" label holds a 50% equity allocation—a mere five-percentage-point difference from the AC TDF's 45% landing point. The "to" versus "through" label did not change the outcome. Participants in the AC TDF and participants in Vanguard TDF experienced statistically indistinguishable drawdowns under the most stress-testing market event of the Class Period.

[15] Morningstar's Target-Date taxonomy assigns each vintage of a target-date fund series to a vintage-specific Morningstar Category named for the fund's target retirement year. The vintage-named Target-Date Morningstar Categories are: Target-Date 2000–2010, Target-Date 2015, Target-Date 2020, Target-Date 2025, Target-Date 2030, Target-Date 2035, Target-Date 2040, Target-Date 2045, Target-Date 2050, Target-Date 2055, Target-Date 2060, and Target-Date 2065+. *See* Morningstar Category Classifications: U.S. Funds (Oct. 2025), at 2, 28–31. As used herein, "Target-Date 20XX" refers to those vintage-named Categories collectively, where the "XX" stands in for the specific vintage year—*i.e.*, the AC TDF 2030 fund and the Vanguard 2030 fund are each classified in the Target-Date 2030 Category, the AC TDF 2035 fund and the Vanguard 2035 fund are each classified in the Target-Date 2035 Category, and so on across all vintages.

76. Third, the T. Rowe Price Target Series ("TRP TDF") is like the AC TDFs, an actively managed, fund-of-funds TDF series classified by Morningstar in the same Target-Date 20XX Categories. With its "through-retirement" label, the TRP TDF holds a 42.5% equity allocation at retirement—2.5% below the AC TDF's 45%.

77. Fourth, the BlackRock LifePath Index Target Retirement Series ("BlackRock LifePath") shares the same fund-of-funds structure as the AC TDFs and comparators before it as well as the "to-retirement" categorization as the AC TDF. Like the AC TDF, the BlackRock LifePath series follows a glide path that reaches its terminal equity allocation at the target retirement date and remains static thereafter. BlackRock LifePath holds a 40% equity allocation at retirement—five percentage points below the AC TDF's 45%.

78. The AC TDFs sit inside the comparator band on both metrics. By equity allocation at retirement (the most important point for risk): BlackRock LifePath 40%, TRP TDF 42.5%, AC TDFs 45%, American Funds TDF 46%, Vanguard TDF 50%. By Q1 2020 drawdown: BlackRock Lifepath -7.59%, American Funds TDF -8.85%, AC TDFs -10.15%, Vanguard TDF -10.74%. Three are "through" funds and two are "to" funds; the labels neither predict nor explain where AC TDFs sit on either metric. Whatever categorical labels apply, the actual asset-allocation and risk experiences of participants in the AC TDF mirror those in the comparator series.

79. The medians shown in Figure 5 tell the same story and compel the same conclusion. The median "through" series held 52% equity at retirement and lost 10.74% in Q1 2020; the median "to" series held 35% equity and lost 7.60%.[16] The AC TDFs' 45% and -10.15% sit closer to the "through" median than to the "to" median on both metrics despite the series' "to" label. In other words, these marketing labels are of limited significance, especially to fiduciaries.

[16] Pacholok, *supra* note 5, at 38.

80. The same conclusion follows from how the target-date industry itself groups and evaluates these funds. Morningstar's peer-group classifications, and American Century's own marketing comparisons, both treat cross-label target-date comparisons as appropriate.

81. Morningstar classifies each vintage of the AC TDF series in the same Morningstar Category as the corresponding vintages of the comparator series—the "Target-Date 2030" category for the 2030 vintage, "Target-Date 2040" for the 2040 vintage, and so on through the lifecycle. Morningstar's official category definition for the Target-Date 2030 vintage states:

> Target-date portfolios provide diversified exposure to stocks, bonds, and cash for those investors who have a specific date in mind (in this case, the years 2026-30) for retirement. These portfolios aim to provide investors with an optimal level of return and risk, based solely on the target date. Management adjusts the allocation among asset classes to more-conservative mixes as the target date approaches, following a preset glide path. A target-date portfolio is part of a series of funds offering multiple retirement dates to investors.

Morningstar Category Classifications: U.S. Funds (Oct. 2025), at 29.

82. To be clear, the Morningstar Category definition does not qualify membership by glide-path label ("to" versus "through") or management style ("active" versus "passive"). Funds within the same Morningstar Category are constructed by Morningstar to be peer-comparable for purposes of performance, risk, and asset-allocation analysis, and are routinely used for those purposes by plan fiduciaries, retirement plan consultants, and courts. *See, e.g.*, *Snyder v. UnitedHealth Grp., Inc.*, No. CV 21-1049 (JRT/BRT), 2021 WL 5745852, at *4 (D. Minn. Dec. 2, 2021) ("the Morningstar Comparators constitute meaningful benchmarks because they fall within the same universe, and incorporate similar purposes, asset allocations, and risk exposure as the [challenged] TDFs").

83. Even American Century itself acknowledges this peer-group framework: on its public-facing marketing materials for the AC TDF series, American Century directly compares the One Choice In Retirement I Class fund (ATTIX), an actively managed "to-retirement" series, against the Fidelity Advisor Freedom 2015 I Class fund (FFVIX), an actively managed "through-retirement" series, on standard deviation, Sharpe Ratio, downside capture, and one-, five-, ten-, fifteen-, and twenty-year total returns over the period November 1, 2007 through December 31, 2025.[17] For some period of time before and at least through October 7, 2024, AC compared their TDF series to the American Funds TDF in their marketing materials on their website.[18] At all relevant times, American Century itself has marketed the AC TDFs by comparing its series to those of its competitors without regard for the superficial "to" or "through" labels.

84. The actual economic characteristics are what matter to prudent fiduciaries, not superficial labels. The AC TDFs align with the comparator series on retirement-date equity exposure, sequence-of-returns risk, fixed-income duration, and benchmark co-movement.

85. As another example, sequence-of-returns risk is most acute in the years just before and after retirement. A market drop in that window, paired with ongoing withdrawals, can leave a portfolio that never recovers—even though the same returns in a different order would have been harmless. What controls that risk is not a fund's "to" or "through" label but its equity allocation in the window. As noted above, at retirement, the AC TDF holds 45% equity. BlackRock LifePath holds 40%. The TRP TDF holds 42.5%. American Funds holds 46%. Vanguard holds 50%. The AC TDFs sit in the middle of that band. A participant in the AC TDF retiring in 2030 bears the

---

[17] American Century Investments, *One Choice Target Date Portfolios*, https://www.americancentury.com/advisors/client-conversations/target-date-solutions/one-choice-target-date-portfolios/ ("One Choice is represented by the American Century One Choice In Retirement I Fund. The Aggressive Target Date Fund (TDF) is represented by Fidelity Advisor Freedom 2015 I.") (last accessed April 27, 2026).

[18] *See* https://web.archive.org/web/20241012082448/https://www.americancentury.com/advisors/client-conversations/target-date-solutions/one-choice-target-date-portfolios/ (last accessed May 1, 2026)

same market exposure and sequence-of-returns risk as a participant in any of the four comparator series.

86. The AC TDF's bond-sleeve interest-rate risk is also typical for its category. The AC TDF's effective duration for the Class Period lands in the middle of the pack when compared to the four comparator series:

| Ticker | Name | Average Eff Duration Survey 2020-12 | Average Eff Duration Survey 2021-12 | Average Eff Duration Survey 2022-12 | Average Eff Duration Survey 2023-12 | Average Eff Duration Survey 2024-12 | Average Eff Duration Survey 2025-12 |
|---|---|---|---|---|---|---|---|
| | American Century One Choice 2030 IX | 5.66 | 5.57 | 5.79 | 5.55 | 5.06 | 4.93 |
| RFETX | American Funds 2030 Trgt Date Retire R6 | 4.50 | 4.84 | 5.35 | 1.74 | 5.86 | 5.42 |
| VTHRX | Vanguard Target Retirement 2030 Fund | 7.17 | 7.35 | 6.75 | 6.67 | 6.23 | 6.00 |
| TWRRX | T. Rowe Price Target 2030 I | 4.67 | 5.72 | 5.44 | 5.24 | 4.77 | 4.67 |
| LINIX | BlackRock LifePath® Index 2030 Instl | 6.30 | 6.80 | 3.11 | 3.08 | 3.12 | 2.70 |

87. In the first quarter of 2025, Defendant finally removed the AC TDF and switched to the Nuveen Lifecycle Index Funds. *See supra* ¶¶ 25-26. ERISA required Defendant to remove it as soon as the available data showed imprudence—no later than 2020. *Tibble v. Edison Int'l*, 575 U.S. 523, 530 (2015).

**4. Defendant failed to follow a prudent process in retaining the AC TDFs**

88. With the comparator universe established, the question becomes what a prudent fiduciary would have seen when monitoring the AC TDFs. By 2020 at the latest, the available data required removal.

89. Defendant retained the AC TDFs from 2018 through at least the end of 2024.

90. Defendant retained the AC TDFs despite readily available then prevailing information (available both prior to and throughout the Class Period) which indicated dramatically inferior performance, investment manager metrics, and lower performance in risk adjusted metrics.

91. In other words, examining the information available to Defendant in 2020, a fiduciary following the minimum standard of care for prudent investors, when evaluating whether to continue to retain the AC TDF series would have determined that its investment performance

was inferior, its risk-adjusted performance was inferior, and that its glide path and investment philosophy were being rejected by the data and the market, and thus removed the AC TDF by early 2020, at the latest.

92. As noted above, for several years prior to and continuing throughout the Class Period, the AC TDF has consistently underperformed other target date series options and the alternatives that AC used as benchmarks themselves. *See supra* ¶ 84.

93. Specifically, under the circumstances prevailing in 2020, when confronted with the information that the AC TDF at the end of 2018 and 2019 had consistently underperformed in 3- and 5-year returns as well as MPT manager, risk, and cost metrics, a prudent fiduciary following the standard of care for prudent investors would not have decided to continue to retain the AC TDF throughout 2020.

94. Figure 6 below provides a summary of 3- and 5-year investment returns and metrics underperformance compared to industry leading available alternative target date series (described in more detail below) in 2018 and 2019. Over those two years, available data showed that AC TDF underperformed in 3- and 5-year lookback metrics against four industry leading TDFs in 94% of time periods in available data. The AC TDF therefore consistently underperformed for 6 years by the end of 2019 across all metrics (just prior to the start of the Class Period).

**Figure 6**

**Performance Metrics Comparison Summary January 2018 - December 2019**

| Metric Analyzed | Total # of Metrics Analyzed Against Comparators | # of Metrics AC Underperformed | Percentage of Metrics AC Underperformed |
|---|---|---|---|
| 3 - Year Return | 55 | 55 | 100% |
| 5 - Year Return | 24 | 24 | 100% |
| Sharpe Ratio - 3 - Year | 55 | 53 | 96% |
| Sharpe Ratio - 5 - Year | 24 | 19 | 79% |
| Information Ratio 3 - Year | 55 | 55 | 100% |
| Information Ratio 5 - Year | 24 | 24 | 100% |
| Alpha 3 - Year | 55 | 50 | 91% |
| Alpha 5 - Year | 24 | 20 | 83% |
| Sortino Ratio - 3 - Year | 55 | 52 | 95% |
| Sortino Ratio - 5 - Year | 24 | 20 | 83% |
| Batting Average 3 - Year | 55 | 54 | 98% |
| Batting Average 5 - Year | 24 | 23 | 96% |
| Turnover Ratio | 56 | 47 | 84% |
| **Total** | **530** | **496** | **94%** |

95. Given AC TDF's underperformance in 496 out of 530 (94%) of reviewed time periods for each metric[19] examining 3- and 5-year lookbacks, Defendant had no reason to expect AC TDF to improve or outperform during the Class Period starting in 2020. Unsurprisingly, failure to remove AC TDF in 2020 based on this information resulted in millions of dollars of harm to the Plan. Figure 6 below calculates approximate losses to the Plan incurred due to Defendant's failure to replace the AC TDF with a more prudently selected and investable comparator TDFs.

[19] Each Representing the total number of available data points for each metric analyzed from January 2018 through December 2019.

**Figure 6**

**Approximate Performance Losses January 2020 - December 2024**

| Target Date Series Name | AC's Approximate Performance Losses ($) vs. Comparators |
|---|---|
| American Funds Target Date Retirement Series R6 | -$8,177,017 |
| Vanguard Target Retirement Series Inv | -$4,316,043 |
| T. Rowe Price Target Series I | -$3,594,922 |
| BlackRock LifePath Index Instl | -$3,588,895 |

96. A prudent fiduciary following the standard of care under the circumstances then prevailing in 2020 (including the examination of 2018 and 2019 3- and 5-year lookback data) would have evaluated the AC TDF series against, at a minimum, the investable market-leading TDF benchmarks identified above, under the MPT accepted investment metrics set forth below and, regardless of which combination of reasonable benchmarks and metrics chosen, a fiduciary acting under the prudent investor standard under the circumstances then prevailing in 2020, **could not have concluded that it was prudent to continue to retain the AC TDF series** unless they employed a flawed process.

97. Similarly, the table below illustrates that the details of the AC TDF series underperformance[20] when evaluated using several investment metrics that are commonly used, accepted, and required by MPT and the Prudent Investor Standard. Using these commonly accepted and required metrics for comparison demonstrates that a prudent process would have revealed that the AC TDF series consistent underperformance under all metrics, removed it in early 2020, and avoided the harm caused to the Plan.

98. A prudent process would have also removed the AC TDF prior to the Class Period, but at the latest, and more relevant to this action, in 2020. Every subsequent month, quarter, or

[20] "Underperformance" in this context includes both commonly accepted investment manager metrics as well as the investment returns.

year that Defendant failed to remove this option was a result of imprudence because the AC TDF series underperformed a shocking 94% of commonly accepted MPT metrics of 3- and 5-year lookbacks in 2020[21].

99. In fact, by the end of 2018 it would have been evident to a prudent process that under the circumstances then prevailing, the available information revealed that across all categories of metrics, whether return/performance metrics, risk-adjusted performance metrics, fee metrics, and others, the AC TDF provided no advantages over its peers.

100. In 2020 the picture was no different. As set forth below, the available data and information in 2020 mandates a conclusion that a prudent fiduciary examining AC TDF past performance would have removed the AC TDF From the Plan by 2020 at the latest. Defendant's failure to do so necessitates an inference that Defendant employed an imprudent process for several years.

101. These facts also necessitate the further inference that regardless of whether Defendant weighed one category of MPT metrics over another, all available information at the time required Defendant to remove the AC TDF and select a better performing TDF alternative.

102. Nevertheless from 2018 through 2024, Defendant failed to eliminate the AC TDF series from the plan, retaining approximately 65% of the Plan's assets in the demonstrably underperforming and imprudent AC TDF from 2020 through 2022 and increasing that share of investment to approximately 66% from 2023 through the end of 2024.

103. Fiduciaries following a prudent process would not have ignored AC TDF's underperformance across all types of metrics as compared to better available options. This is further emphasized by the fact that **the comparator TDFs are established industry leaders**, and

[21] The most relevant available information back in 2020 was 2019 and 2018 lookback performance.

among the top 5 most selected options that any prudent fiduciary would be aware of and would compare their selected TDF against. In other words, Plaintiff did not cherry pick fringe or unproven peers for comparison.

104. A prudent process would have uncovered AC TDF's poor performance against established peers.

105. The tables in Figures 7-10 below illustrate an analysis of the several of the most important and commonly accepted investment performance metrics incorporated into the Prudent Investor Standard when comparing the AC TDF series to other available alternatives on an annual basis.

106. Each column of each table represents the circumstances at the end of each calendar year that Defendant would have had available to it, and should have used to compare the AC TDF series to meaningful and available alternative series had Defendant employed a prudent process to determine whether to retain the AC TDF series.

107. For each metric comparison, if the AC TDF series underperformed more than 50% of the time, the metric is highlighted in red. If, as is rarely the case, the AC TDF series metric underperformed less than 50% of the time, the metric is highlighted in green and if the metric is unavailable, it is left blank.

108. As illustrated in Figure 7 below, when compared on a TDF series-to-series basis, the AC TDF series underperformed the American Funds Target Date series under all metrics looking back 3- and 5-years. The chart below demonstrates that in 2020, if Defendant reviewed AC TDF's performance looking back 3- and 5-years across MPT metrics at the end of 2019 and 2020, they would have found that the AC TDF underperformed 100% of the time each year under each metric.

**Figure 7**

**American Century Target Date Series IX vs American Funds Target Date Retirement Series R6: Percentage of Metrics AC Underperformed**

| | 2018 | 2019 | Total 2018-2019 |
|---|---|---|---|
| 3 - Year Return | 100% | 100% | 100% |
| 5 - Year Return | | 100% | 100% |
| Sharpe Ratio - 3 - Year | 100% | 100% | 100% |
| Sharpe Ratio - 5 - Year | | 100% | 100% |
| Information Ratio 3 - Year | 100% | 100% | 100% |
| Information Ratio 5 - Year | | 100% | 100% |
| Alpha 3 - Year | 100% | 100% | 100% |
| Alpha 5 - Year | | 100% | 100% |
| Sortino Ratio - 3 - Year | 100% | 100% | 100% |
| Sortino Ratio - 5 - Year | | 100% | 100% |
| Batting Average 3 - Year | 100% | 100% | 100% |
| Batting Average 5 - Year | | 100% | 100% |
| Turnover Ratio | 100% | 100% | 100% |

109. Similarly, as shown in Figure 8, when compared on a series-to-series basis, the AC TDF series underperformed the T. Rowe Price Target Date Series ("TRP TDF") under all metrics looking back 3- and 5-years, except Turnover Ratio in 2018.

**Figure 8**

**American Century Target Date Series IX vs T. Rowe Price Target Series I: Percentage of Metrics AC Underperformed**

| | 2018 | 2019 | Total 2018-2019 |
|---|---|---|---|
| 3 - Year Return | 100% | 100% | 100% |
| 5 - Year Return | | 100% | 100% |
| Sharpe Ratio - 3 - Year | 100% | 100% | 100% |
| Sharpe Ratio - 5 - Year | | 100% | 100% |
| Information Ratio 3 - Year | 100% | 100% | 100% |
| Information Ratio 5 - Year | | 100% | 100% |
| Alpha 3 - Year | 100% | 100% | 100% |
| Alpha 5 - Year | | 100% | 100% |
| Sortino Ratio - 3 - Year | 100% | 100% | 100% |
| Sortino Ratio - 5 - Year | | 100% | 100% |
| Batting Average 3 - Year | 100% | 100% | 100% |
| Batting Average 5 - Year | | 100% | 100% |
| Turnover Ratio | 0% | 71% | 36% |

110. Likewise, the AC TDF series underperformed the Vanguard Target Retirement Series ("Vanguard") under all but three metrics looking back 3- and 5-years from the end of 2018 and 2019.

**Figure 9**

**American Century Target Date Series IX vs Vanguard Target Retirement Series Inv: Percentage of Metrics AC Underperformed**

| | 2018 | 2019 | Total 2018-2019 |
|---|---|---|---|
| 3 - Year Return | 100% | 100% | 100% |
| 5 - Year Return | | 100% | 100% |
| Sharpe Ratio - 3 - Year | 100% | 71% | 86% |
| Sharpe Ratio - 5 - Year | | 33% | 33% |
| Information Ratio 3 - Year | 100% | 100% | 100% |
| Information Ratio 5 - Year | | 100% | 100% |
| Alpha 3 - Year | 100% | 71% | 86% |
| Alpha 5 - Year | | 33% | 33% |
| Sortino Ratio - 3 - Year | 100% | 57% | 79% |
| Sortino Ratio - 5 - Year | | 33% | 33% |
| Batting Average 3 - Year | 100% | 86% | 93% |
| Batting Average 5 - Year | | 83% | 83% |
| Turnover Ratio | 100% | 100% | 100% |

111. In that same vein, the AC TDF series underperformed the BlackRock LifePath Index Target Retirement Series ("BlackRock") under all metrics looking back 3- and 5-years from the end of 2018 and 2019.

**Figure 10**

**American Century Target Date Series IX vs BlackRock LifePath Index Instl: Percentage of Metrics AC Underperformed**

| | 2018 | 2019 | Total 2018-2019 |
|---|---|---|---|
| 3 - Year Return | 100% | 100% | 100% |
| 5 - Year Return | | 100% | 100% |
| Sharpe Ratio - 3 - Year | 100% | 100% | 100% |
| Sharpe Ratio - 5 - Year | | 83% | 83% |
| Information Ratio 3 - Year | 100% | 100% | 100% |
| Information Ratio 5 - Year | | 100% | 100% |
| Alpha 3 - Year | 50% | 100% | 77% |
| Alpha 5 - Year | | 100% | 100% |
| Sortino Ratio - 3 - Year | 100% | 100% | 100% |
| Sortino Ratio - 5 - Year | | 100% | 100% |
| Batting Average 3 - Year | 100% | 100% | 100% |
| Batting Average 5 - Year | | 100% | 100% |
| Turnover Ratio | 100% | 100% | 100% |

112. A prudent fiduciary examining the AC TDF in 2020, under the circumstances then prevailing, would have recognized this dramatic level of underperformance compared to industry leading available alternatives, considered it holistically under accepted MPT metrics, and removed the AC TDF in 2020.

113. In other words, prudent fiduciaries utilizing a prudent process incorporating commonly accepted performance evaluation metrics required by MPT would not have retained the AC TDF series in 2020.

114. Ultimately a prudent process would have evaluated the retention of the selected AC TDF in relation to at least the available industry leading alternatives. Such a comparison would have revealed only one prudent choice: to remove the AC TDF in 2020 because it provided no advantages against available alternatives in 3- and 5-year lookbacks in multiple years. Defendant's

failure to do so raises the inference that Defendant did not employ a prudent process in selecting and monitoring its TDFs.

**5. Vintage-to-vintage data confirms the imprudence**

115. The series-level data was sufficient by itself to require removal. A vintage-to-vintage review would have confirmed the same conclusion for the specific retirement-date vintages available to Plan participants.

116. As outlined above, a prudent fiduciary examining the AC TDF in 2020 (under the circumstances then prevailing) would not have continued to retain the AC TDF in light of the dramatic level of underperformance compared to industry leading available alternatives on a series to series basis.

117. But while the results of the series-level comparisons make clear that conducting a vintage-to-vintage comparison would likely also reveal significant underperformance, a prudent fiduciary would have nonetheless completed a vintage-to-vintage comparison as well to confirm.

118. Unsurprisingly, the vintage-to-vintage comparison likewise would have illustrated the AC TDF's substantial underperformance under the circumstances then prevailing in 2020 (2018 and 2019 data).

119. Each of the comparable AC TDF series vintages also underperformed when evaluated by the commonly accepted MPT metrics (Sharpe, Sortino, Alpha, etc.).

120. Appendix A to this complaint sets forth the comparison of every comparable vintage of the AC TDF series to the same vintage for available industry leading alternative TDF series options, broken down by performance as compared to the commonly accepted MPT metrics.

121. The standard of care for selection and monitoring investments for a plan the size of the Plan would require quarterly reviews of the investment performance of selected options. Accordingly, Defendant would have had a minimum of four opportunities (each quarter in 2019)

to remove the AC TDF series based on the 2018 performance and by the Q1 2020 quarterly meeting Defendant would have had metrics for all of 2018 and 2019 providing the absolute latest time by which the AC TDF series should have been removed.

122. For each AC TDF vintage, the tables in Appendix A provide the investment metrics identified throughout this complaint for the two years immediately preceding the Class Period, which was the most up to date data available to Defendant in 2020. If the AC TDF series vintage underperformed, then the metric is highlighted in red. If the AC TDF series vintage outperformed, the metric is highlighted in green, and ties are left white. When data is not available the space is left blank. The 2030 vintage comparison against American Funds from Appendix A is set forth below as Figure 11.

**Figure 11**

**American Century One Choice 2030 IX**

| American Century One Choice 2030 IX | 2018 | 2019 |
|---|---|---|
| 3 - Year Return | 4.84% | 8.70% |
| 5 - Year Return | | 6.30% |
| Sharpe Ratio - 3 - Year | 0.586 | 1.004 |
| Sharpe Ratio - 5 - Year | | 0.755 |
| Information Ratio 3 - Year | -0.978 | -1.148 |
| Information Ratio 5 - Year | | -0.623 |
| Alpha 3 - Year | -0.67% | -0.35% |
| Alpha 5 - Year | | -0.07% |
| Sortino Ratio - 3 - Year | 0.809 | 1.492 |
| Sortino Ratio - 5 - Year | | 1.164 |
| Batting Average 3 - Year | 0.361 | 0.361 |
| Batting Average 5 - Year | | 0.450 |
| Turnover Ratio | 16.00 | 27.00 |

123. Figure 12, below, provides the investment metrics for the comparable vintage benchmark and, as above, if the comparable vintage benchmark outperformed the AC TDF series benchmark, then the metric is highlighted in green, with underperformance highlighted in red and

ties left white. The 2030 vintage comparison against American Funds from Appendix A is set forth below.

**Figure 12**

American Funds 2030 Trgt Date Retire R6

| RFETX | 2018 | 2019 |
|---|---|---|
| 3 - Year Return | 6.92% | 10.86% |
| 5 - Year Return | 5.63% | 8.07% |
| Sharpe Ratio - 3 - Year | 0.777 | 1.157 |
| Sharpe Ratio - 5 - Year | 0.639 | 0.853 |
| Information Ratio 3 - Year | 0.470 | 0.568 |
| Information Ratio 5 - Year | 0.790 | 0.537 |
| Alpha 3 - Year | 0.70% | 0.89% |
| Alpha 5 - Year | 1.10% | 0.77% |
| Sortino Ratio - 3 - Year | 1.135 | 1.766 |
| Sortino Ratio - 5 - Year | 0.987 | 1.352 |
| Batting Average 3 - Year | 0.611 | 0.611 |
| Batting Average 5 - Year | 0.617 | 0.583 |
| Turnover Ratio | 8.00 | 0.00 |

124. And finally, Figure 13 provides the difference for each performance metric, with AC TDF series vintage underperformance highlighted in red, outperformance in green, and ties also left green. The 2030 vintage comparison against American Funds from Appendix A is set forth therein.

**Figure 13**

**American Century One Choice 2030 IX & American Funds 2030 Trgt Date Retire R6 Comparison**

| | 2018 | 2019 |
|---|---|---|
| 3 - Year Return | 2.08% | 2.16% |
| 5 - Year Return | | 1.77% |
| Sharpe Ratio - 3 - Year | 0.191 | 0.153 |
| Sharpe Ratio - 5 - Year | | 0.099 |
| Information Ratio 3 - Year | 1.448 | 1.717 |
| Information Ratio 5 - Year | | 1.160 |
| Alpha 3 - Year | 1.37% | 1.25% |
| Alpha 5 - Year | | 0.84% |
| Sortino Ratio - 3 - Year | 0.326 | 0.274 |
| Sortino Ratio - 5 - Year | | 0.189 |
| Batting Average 3 - Year | 0.250 | 0.250 |
| Batting Average 5 - Year | | 0.133 |
| Turnover Ratio | -8.00 | -27.00 |
| # of Underperforming Metrics | 7 | 13 |
| # of Total Metrics | 7 | 13 |
| % of Underperforming Metrics | **100%** | **100%** |

125. As the 2030 comparison example demonstrates, AC TDF 2030 underperformed the American Funds 2030 in all metrics in both 2018 and 2019, which represents the data available to Defendant in 2020.

126. Appendix A to this complaint provides the same charts demonstrating underperformance across the industry-leading comparator TDFs across the 2030-2060 vintages.

127. Thus, a fiduciary following a prudent process would have reviewed at least all the pleaded information in 2020 and would have determined that it was imprudent to continue to retain the AC TDF series and removed it.

128. Despite all the metrics and performance data imploring Defendant to remove the underperforming AC TDF series, Defendant not only failed to remove the AC TDF series prior to the Class Period, but also in 2020, and retained it through at least the end of 2024.

129. As a direct result of this conduct, the Plan participants have suffered investment losses of tens of millions of dollars.

**B. Defendant Violated ERISA's Fiduciary Duties by Failing to Follow the Plan Documents**

130. ERISA requires fiduciaries to act "solely in the interest of participants," to do so with "the care, skill, prudence, and diligence" of a prudent person, "**in accordance with the documents and instruments governing the plan**," and to refrain from "deal[ing] with the assets of the plan" in its own interest. 29 U.S.C. §§ 1104(a)(1) (emphasis added).

131. As detailed below, despite their fiduciary obligations to follow the governing Plan documents, Defendant failed to allocate Plan assets (forfeitures) as instructed by the Plan. Specifically, despite the Plan documents' instruction that, if any forfeitures remained after restoring previously forfeited amounts to participants' accounts, "[a]ny remaining forfeitures will be… [***u***]***sed first to offset Plan expenses***" (emphasis added), upon information and belief Defendant instead chose to apply nearly $1.5 million of Plan forfeitures to offset employer contributions and left over $1.3 million unallocated between 2020 and 2024, while using none to defray the nearly $2.5 million of Plan expenses. Defendant's failure to follow the prioritization for use of forfeitures set forth in the Plan resulted in Plan participants paying expenses the Plan promised to pay, reducing Plan participants' retirement funds.

132. To remedy these fiduciary breaches, Plaintiff, individually, on behalf of the Plan, and as representative of a class of participants and beneficiaries of the Plan, brings this action on behalf of the Plan under 29 U.S.C. § 1132(a)(2) to enforce Defendant's personal liability under 29 U.S.C. § 1109(a) to make good to the Plan all losses resulting from each breach of fiduciary duty and to restore to the Plan any profits made through Defendant's use of the Plan's assets. In addition,

Plaintiff seeks any other equitable or remedial relief for the Plan as the Court may deem appropriate.

**1. Relevant Plan Terms**

***Employer Contributions***

133. There are several types of contributions that can be added to a Plan participant's account, including: Employee Contributions and Employer Contributions.

134. Relevant to the plan violation aspect of this case, Employer Contributions under the terms of the Plan ("Employer Contributions") means the contributions made by the Employer on behalf of each of Eligible Participant under the contribution program.

135. Upon their deposit into the Plan's trust fund, all participant contributions and Employer contributions become Plan assets.

136. Throughout the Class Period, Employer Contributions have been deposited into the Plan's trust fund and allocated to individual participant accounts.

***Vesting and Forfeiture of Employer Contributions***

137. Under the terms of the Plan, participants are immediately vested in their own Employee Contributions, as well as any actual earnings thereon. Participants are not 100% vested in Matching Contributions until the completion of a period of service between one and six years, pursuant to the Plan's vesting schedule.

138. To the extent a participant is not 100% vested upon termination of employment, the participant forfeits the value of Employer Contributions according to the vesting schedule.

139. The Plan document instructs that "[a]ny Forfeitures occurring will be disposed of or reallocated in accordance with the Employer's elections in the Adoption Agreement, including, without limitation, use of such Forfeitures to restore Participants' Accounts in accordance with this Article, to reduce or increase Employer Contributions for the next Plan Year, for reallocation

among Participants' Accounts in accordance with the forfeiture allocation method of the Plan based on a definite uniform formula hereunder, or to offset Plan expenses." FJ Management's Plan document, Art. IX, § 9.12, FJM_000074.

140. The May 31, 2023 adoption agreement for the Plan instructed Defendant that "Forfeitures will first be used to restore previously forfeited amounts to Participant's Accounts" and that "[a]**ny remaining Forfeitures will be… [u]sed first to offset Plan expenses.**" Adoption Agreement, FJM_000171 (emphasis added). Defendant could use Forfeitures to reduce Employer Contributions only after offsetting Plan expenses:

D. ***ALLOCATION OF FORFEITURES***. Forfeitures will first be used to restore previously forfeited amounts to Participant's Accounts. Any remaining Forfeitures will be:

| ***Nonelective*** | ***Match*** | |
|---|---|---|
| ☒ | ☒ | Used first to offset Plan expenses. |
| ☒ | ☒ | Used to reduce future Matching Contributions. |
| ☒ | ☒ | Used to reduce future Nonelective Contributions. |
| ☐ | ☐ | Reallocated to other Participants in proportion to Compensation, as additional Matching Contributions. |
| ☐ | ☐ | Reallocated to other Participants in proportion to Compensation, as additional Nonelective Contributions. |
| ☐ | ☐ | Added to Matching Contributions. |
| ☐ | ☐ | Added to Nonelective Contributions. |
| N/A | ☐ | Reallocated to all Participants in proportion to Elective Deferrals as Matching Contributions. |

*Id.*

141. Thus, Defendant was unequivocally instructed to use Forfeitures ***first to offset*** plan expenses, ***before*** reducing employer contributions.

142. Defendant was specifically instructed to use forfeitures first to offset plan expenses from at least from June 2023 through December 31, 2025.[22]

143. While Plaintiff does not have access to any Adoption Agreement that may have been in place from the beginning of the Class Period until May 2023, upon information and belief Defendant was likewise instructed to use Forfeitures first to offset Plan expenses from 2020 to 2023. *See* Basic Plan Document No. 01, § 9.12, FJM_000074 (noting that "[a]ny Forfeitures occurring will be disposed of or reallocated in accordance with the Employer's elections in the Adoption Agreement" and that "[i]n the absence of such elections in the Adoption Agreement, any Forfeitures will be used to restore Participants' Accounts, to offset Plan expenses…" [and listing other options]).

144. Throughout the Class Period, the Plan also required prompt allocation of forfeitures: "no Forfeiture….shall remain unallocated beyond the end of the Plan Year in which it occurs, or, if the Employer elects in the Adoption Agreement to use Forfeitures to reduce Plan expenses or Employer Contributions, such Forfeitures shall be used promptly in the Plan Year in which they occur or, in appropriate situations, no later than the immediately succeeding Plan Year." Basic Plan Document No. 01, § 9.13, FJM_000074.

**2. Defendant's Failure to Follow Plan Terms**

145. Throughout the Class Period, the Plan incurred plan expenses that the Plan instructed to be first offset by forfeitures.

146. The Plan's Form 5500s, which are filed with the Department of Labor ("DOL") for each Plan year and publicly available, detail the amount Defendant paid in Employer

[22] Effective January 1, 2026, the Plan was amended to remove the instruction that Forfeitures must first be allocated to offset Plan expenses. Amendment No. 4 to the Plan, FJM_000238–39,

Contributions. The Plan's Form 5500s for a given plan year are typically filed in the fall of the next calendar year.

147. Based on Defendant's disclosures to the DOL throughout the Class Period, the Plan paid a minimum of **$2,491,546** in Plan Expenses between 2020 and 2024 as well as an undisclosed amount of indirect compensation:[23]

| Plan Expenses Paid | Amount |
|---|---|
| 2024 | $827,034 |
| 2023 | $446,968 |
| 2022 | $415,322 |
| 2021 | $445,896 |
| 2020 | $356,326 |
| **Total** | **$2,491,546** |

148. Based on Defendant's disclosures to the DOL throughout the Class Period, Defendant offset a minimum of **$1,495,314** of Employer contributions with forfeitures:

| Employer Contributions Offset | Amount |
|---|---|
| 2024 | $599,403 |
| 2023 | $263,945 |
| 2022 | $196,394 |
| 2021 | $98,809 |
| 2020 | $336,763 |
| **Total** | **$1,495,314** |

[23] The Plan carried untransparent substantial additional indirect plan expenses paid by the Plan that could have been offset as well. Until discovery Plaintiff cannot ascertain the full extent of the losses sustained through Defendant's failure to follow Plan terms.

149. Based on Defendant's disclosures to the DOL throughout the Class Period, Defendant left unallocated a minimum of **$1,380,358** of forfeitures.

| **Unallocated Forfeitures** | **Amount** |
|---|---|
| 2024 | $1,015,553 |
| 2023 | $124,139 |
| 2022 | $146,230 |
| 2021 | $72,815 |
| 2020 | $21,621 |
| **Total** | **$1,380,358** |

150. Defendant's behavior was particularly egregious in 2024: Defendant left $1,015,553 of forfeitures unallocated instead of applying them to offset Plan expenses as instructed by the Plan. Plan expenses equaled $827,034 in 2024 and could have—and should have according to the terms of the Plan—been entirely offset by the unallocated forfeitures.

151. None of the Form 5500s filed for the Plan for 2020 to 2024 indicated that Defendant used any forfeitures to offset Plan expenses. Accordingly, upon information and belief, during the Class Period Defendant did not use any forfeitures to offset Plan expenses as required by the Plan.

152. Plan expenses always reduce the funds available to Plan participants for distribution and/or investing—and thereby reduce the value of individual participant accounts—depriving the Plan of funds that otherwise would have been earned on the amounts deducted. If Plan expenses were paid with forfeitures as directed by the Plan terms, Plaintiff and the Plan would have had more funds.

153. At all relevant times during the Class Period, Defendant should have followed the Plan terms and first offset Plan expenses before remitting nearly $1.5 million back to the employer to offset employer contributions.

154. Similarly, and alternatively, it was administratively feasible to use unallocated forfeitures to first offset Plan Expenses as required by the Plan and avoid carrying unallocated forfeitures over to the next calendar year.

155. From 2020 through at least 2024, upon information and belief, at no point did the Defendant offset Plan Expenses as required by the Plan.

156. A prudent and loyal fiduciary would have followed the Plan terms and allocated forfeitures to offset Plan expenses.

## VI. CLASS ACTION ALLEGATIONS

157. Plaintiff brings this action on behalf of Plaintiff and the Class, which is defined as participants in and beneficiaries of the Plan but excluding Defendant; any person who was or is an officer, director, employee, or a shareholder of 5% or more of the equity of Defendant or is or was a partner, officer, director, or controlling person of Defendant; the spouse or children of any individual who is an officer, director or owner of 5% or more of the equity of Defendant; Plaintiff's counsel; judges of the Court in which this case is pending and their current spouse and children; and the legal representatives, heirs, successors and assigns of any such excluded person.

158. The Class Period includes the six years prior to the date of the filing of this Complaint through the date of judgment.

159. The members of the Class are so numerous, consisting of thousands of members, not including their spouse beneficiaries, who, upon information and belief, are sufficiently

dispersed geographically such that joinder of all members is impracticable. The issues of liability are common to all members of the Class and are suitable to common resolution.

160. Plaintiff's claims are typical of the claims of other members of the Class because their claims arise from the same events, practices and/or courses of conduct described above.

161. Plaintiff's claims are also typical of the claims of other members of the Class because the relief sought consists of requiring Defendant to make the Plan whole for any losses caused by their fiduciary breaches and to disgorge their profits to the Plan. Any such recovery from Defendant will be paid to the Plan and any relief will flow to all Class Members through their accounts in the Plan.

162. Plaintiff will fairly and adequately represent and protect the interests of the Class.

163. Plaintiff does not have any interests antagonistic to or in conflict with those of the Class.

164. Defendant has no unique defenses against Plaintiff that would interfere with Plaintiff's representation of the Class.

165. Plaintiff is represented by counsel experienced in prosecuting ERISA class actions and with particular experience and expertise in litigation involving ERISA breaches of fiduciary duty.

166. The requirements of Fed. R. Civ. P. 23(b)(1)(A) are satisfied. Fiduciaries of ERISA-covered plans have a legal obligation to act consistently with respect to all similarly situated participants and to act in the best interests of the Plan and its participants. This action challenges whether Defendant acted consistently with its obligations under ERISA as to the Plan as a whole. As a result, prosecution of separate actions by individual members would create the risk of

inconsistent or varying adjudications that would establish incompatible standards of conduct relating to the Plan.

167. The requirements of Fed. R. Civ. P. 23(b)(1)(B) are also satisfied. Administration of an ERISA-covered plan requires that all similarly situated participants be treated the same. Resolving whether Defendant fulfilled its fiduciary obligations to the Plan would, as a practical matter, be dispositive of the interests of the other participants in the Plan even if they are not parties to this litigation and would substantially impair or impede their ability to protect their interests if they are not made parties to this litigation by being included in the Class.

168. The requirements of Fed. R. Civ. P. 23(b)(2) are satisfied as to the Class because Defendant has acted and/or failed to act on grounds generally applicable to the Class, making declaratory and injunctive relief appropriate with respect to the Class as a whole. This action challenges whether Defendant breached its fiduciary duties, which would be violations of ERISA as to the Plan as a whole and as to the Class as a whole. The relief sought in this case primarily consists of declarations that Defendant breached its fiduciary duties. As ERISA is based on trust law, any monetary relief consists of equitable monetary relief that would either flow directly from the declaratory or injunctive relief or flow as a necessary consequence of that relief.

169. The requirements of Fed. R. Civ. P. 23(b)(3) are also satisfied. The common questions of law and fact concern whether Defendant breached its fiduciary duties to the Plan. As the members of the Class were participants in that Plan, their accounts were affected by those breaches and violations. Common questions related to liability will necessarily predominate over any individual questions precisely because Defendant's duties and obligations were uniform to all participants and therefore all members of the Class. As relief and any recovery will be on behalf

of the Plan, common questions as to remedies and damages will likewise predominate over any individual issues.

170. A class action is a superior method to other available methods for the fair and efficient adjudication of this action. As the claims generally are brought on behalf of the Plan, resolution of the issues in this litigation will be efficiently resolved in a single proceeding rather than multiple proceedings and each of those individual proceedings could seek recovery for the entire Plan. Class certification is a superior method of proceeding because it will obviate the need for unduly duplicative litigation which might result in inconsistent judgments about Defendant's duties with regard to the Plan.

171. Class action status is warranted under Rule 23(b)(3) because questions of law or fact common to the Class predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## VII. PLAN-WIDE RELIEF

172. ERISA authorizes any participant or beneficiary of the Plan to bring an action on behalf of the Plan to enforce a breaching fiduciary's liability to the Plan under 29 U.S.C. § 1109(a). *See* 29 U.S.C. § 1132(a)(2).

173. Indeed, ERISA breach-of-fiduciary duty actions generally hinge on the uniform conduct of plan fiduciaries with respect to the plan. *Hughes v. Nw. Univ.*, 595 U.S. 170, 176-77 (2022).

174. Plaintiff here seeks relief on behalf of the Plan, *i.e.*, in this case for all losses to the Plan caused by Defendant's breaches, and not only the losses to her individual account.

## VIII. TIMELINESS

175. Within the six-year period prior to Plaintiff's filing this suit, Defendant violated one or more of its fiduciary obligations as described above.

176. At all relevant times during the Class Period, Defendant also made affirmative misrepresentations to participants about the security of their investments, the competence of the portfolio fund managers, the performance history of their investments, and the amount of investment fees they were being charged.

177. At all relevant times during the Class Period, upon information and belief Defendant intentionally concealed its fiduciary breaches to prevent Plan participants from discovering them and avoiding the need to cure the deficiencies.

178. Plaintiff did not acquire actual knowledge of these violations until shortly before commencing this action. Consequently, Plaintiff's claims in this action are timely under 29 U.S.C. § 1113.

## IX. CAUSES OF ACTION

### COUNT I: Breach of Fiduciary Duty of Prudence

179. Plaintiff repeats and realleges the allegations in the preceding paragraphs as if fully set forth herein.

180. At all relevant times, Defendant was a named and/or de facto fiduciary of the Plan within the meaning of ERISA insofar as it exercised discretionary authority or control over the administration and/or management of the Plan or disposition of the Plan's assets. 29 U.S.C. §§ 1002(21) and/or 1102(a)(1).

181. ERISA mandates that fiduciaries act with prudence in the disposition of Plan assets and selection and monitoring of investments. 29 U.S.C. § 1104(a)(1)(B).

182. During the Class Period, Defendant had a fiduciary duty to do all of the following: manage the assets of the Plan prudently and act with the care, skill, diligence, and prudence required by ERISA.

183. At all relevant times during the Class Period, Defendant breached its fiduciary duties of prudence in multiple respects by selecting and continuing to retain a severely underperforming TDF option across all metrics instead of removing it in favor of better and available options.

184. Based on reasonable inferences from the facts set forth in this Complaint, Defendant, as fiduciary of the Plan, had a continuing duty to regularly monitor and independently assess before and during the Class Period whether the Plan's AC TDF was a prudent choice for the Plan and to remove imprudent investment options regardless of how long those investments had been in the Plan.

185. During the Class Period, Defendant breached its fiduciary duty of prudence to Plan participants, including Plaintiff, by failing to engage in a prudent fiduciary process for monitoring the Plan's TDF and by failing to remove the imprudent AC TDF investment within a reasonable period.

186. Defendant was directly responsible for: evaluating and monitoring the Plan's investment options, including the AC TDF, in a prudent fashion; eliminating funds, such as the AC TDF, that underperformed under all metrics; and taking all necessary steps to ensure that the Plan's assets were invested prudently and appropriately.

187. Defendant failed to employ a prudent fiduciary process by failing to monitor and evaluate the AC TDF in comparison to other meaningful benchmark TDFs.

188. Defendant failed to discharge its duties with respect to the Plan with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would have used in the conduct of an enterprise of like character and with like aims, thereby breaching their fiduciary duties of prudence under 29 U.S.C. § 1104(a)(1)(B).

189. As a result of the Defendant's breach of their fiduciary duty of prudence with respect to the Plan, the Plaintiff and Plan participants suffered tens of millions of dollars in unreasonable and unnecessary monetary losses.

190. Defendant is liable under 29 U.S.C. §§ 1109(a) and 1132(a)(2) to make good to the Plan the losses resulting from the fiduciary breaches, to restore to the Plan any profits Defendant made through the use of Plan assets, and to restore to the Plan any profits resulting from the breach of fiduciary duty alleged in this Count. In addition, Defendant is subject to other equitable relief pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2).

**COUNT II: Breach of Fiduciary Duty of Prudence**
**(29 U.S.C. § 1104(a)(1)(D) – Failure to Follow Plan Terms)**

191. Plaintiff repeats and realleges the allegations in the preceding paragraphs as if fully set forth herein.

192. At all relevant times, Defendant was a named and/or de facto fiduciary of the Plan within the meaning of ERISA insofar that it exercised discretionary authority or control over the administration and/or management of the Plan or disposition of the Plan's assets.

193. As a fiduciary of the Plan, Defendant was subject to the fiduciary duties imposed by ERISA § 404(D), 29 U.S.C. § 1104(D).

194. Pursuant to 29 U.S.C. § 1104(a)(1)(D), Defendant was required to discharge its duties to the Plan "solely in the interest of the participants and beneficiaries" and (D) "in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of [ERISA]."

195. Thus, Defendant was required to follow the Plan terms unless they conflicted with ERISA. *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 421, 134 S. Ct. 2459, 2468, 189 L. Ed. 2d 457 (2014)

196. Defendant continually breached this duty with respect to its control and management of the Plan's assets throughout the Class Period by choosing to not allocate all of forfeited funds each year and by utilizing forfeited funds in the Plan first for the benefit of the Company (to offset Employer Contributions) rather than first to offset Plan expenses as required by the Plan.

197. Under the circumstances presented in this case, a prudent fiduciary would have chosen to follow the Plan terms and allocated forfeitures first to offset plan expenses before offsetting any employer contributions.

198. A prudent fiduciary following the Plan document also would have allocated forfeitures promptly and would have offset Plan expenses as required by the Plan document, instead of leaving forfeitures unallocated each Plan year.

199. As a direct and proximate result of Defendant's fiduciary breaches described herein, the Plan suffered millions of dollars in losses.

200. Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), Defendant is liable to restore to the Plan all losses caused by their breaches of fiduciary duties, including, without limitation, the disgorgement of all ill-gotten profits to Defendant resulting from such breaches. In addition,

Plaintiff is entitled to equitable relief and other appropriate relief for Defendant's breaches as set forth in the Prayer for Relief.

## X. PRAYER FOR RELIEF

Wherefore Plaintiff prays that judgment be entered against Defendant on all claims, and requests that the Court order or award the following relief:

A. Certify this action as a class action pursuant to Fed. R. Civ. P. 23, appoint the Plaintiff as class representative, and appoint the firm Milberg, PLLC as class counsel;

B. Order Defendant to disgorge any profits it received as a result of the above breaches of fiduciary duty;

C. Impose a constructive trust over these profits;

D. Impose a monetary surcharge against Defendant and compel Defendant to make good to the Plan all losses to the Plan resulting from Defendant's breaches of fiduciary duty, including restoring to the Plan all losses resulting from imprudent investment of the Plan's assets in the AC TDFs, restoring to the Plan all profits the Defendant made through use of the Plan's assets, and restoring to the Plan all profits which the Plan participants would have made if the Defendant had fulfilled their fiduciary obligations by undertaking TDF suitability and comparative analyses on a timely basis;

E. Apportion all amounts recovered for the Plan among the Plaintiff and the Class;

F. Order that any amount to be paid to the Plan and/or accounts of Plaintiff and Class members can be satisfied by using or transferring any breaching fiduciary's account (or the proceeds of that account) to the extent of that fiduciary's liability;

G. Require Defendant to pay attorneys' fees and the costs of this action pursuant to 29 U.S.C. § 1132(g)(1), or order the payment of reasonable fees and expenses to Plaintiff's counsel

on the basis of the common benefit or common fund doctrine (or other applicable law) out of any money or benefit recovered for the Class in this action;

H. Award pre-judgment and post-judgment interest;

I. Award any other such relief the Court determines Plaintiff and the Class are entitled to pursuant to 29 U.S.C. § 1132(a);

J. Award such other relief as the Court may deem just and proper;

DATED: May 1, 2026

Respectfully submitted,

*/s/ Casondra Turner*
Casondra Turner (MA BBO No: 687682)
**MILBERG, PLLC**
260 Peachtree Street, NW Suite 2200
Atlanta, Georgia 30303
Tel: (866) 252-0878
cturner@milberg.com

Alexandr Rudenco*
**MILBERG, PLLC**
800 S. Gay St., Suite 1100
Knoxville, TN 37929
Tel: (865) 247-0080
arudenco@milberg.com

**Pro Hac Vice Application Forthcoming*

*Counsel for Plaintiff and the Prospective Class*

## CERTIFICATE OF SERVICE

I, Casondra Turner, hereby certify that on May 1, 2026, I caused a copy of the foregoing Amended Class Action Complaint to be filed electronically with the Clerk of Court via the Court's electronic filing system which will send notice to all counsel of record.

*/s/ Casondra Turner*
Casondra Turner