Jacob A. Green (Bar No. 15146)
Annemarie H. Garrett (Bar No. 17573)
**KIRTON MCCONKIE**
2600 West Executive Parkway, Suite 400
Lehi, Utah 84043
Phone: (801) 239-3140
jgreen@kmclaw.com
agarrett@kmclaw.com

William J. Delany, Esq. (*Pro Hac Vice*)
David N. Levine, Esq. (*Pro Hac Vice*)
Larry M. Blocho Jr., Esq. (*Pro Hac Vice*)
**GROOM LAW GROUP, CHARTERED**
1701 Pennsylvania Ave. NW, Suite 1200
Washington, DC 20006
Phone: (202) 861-6643
wdelany@groom.com
dnl@groom.com
lblocho@groom.com

*Counsel for Defendant FJ Management Inc.*

**IN THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH**

| | |
|---|---|
| **JENNIFER WOLFE**, individually and on behalf of the FJ Management Inc. 401(k) Plan, and on behalf of all similarly situated participants and beneficiaries of the plan,<br><br>        Plaintiff,<br><br>        v.<br><br>**FJ MANAGEMENT INC.,**<br>        Defendant. | **DEFENDANT'S MOTION TO DISMISS PLAINTIFF'S AMENDED CLASS ACTION COMPLAINT**<br><br>Case No. 2:26-cv-00383<br><br><br>Judge Robert J. Shelby<br><br>Magistrate Judge Daphne A. Oberg |

**TABLE OF CONTENTS**

SPECIFIC GROUNDS FOR REQUESTED RELIEF .................................................................. 1

INTRODUCTION ................................................................................................................ 1

BACKGROUND .................................................................................................................. 3

LEGAL STANDARD........................................................................................................... 8

ARGUMENT ...................................................................................................................... 9

    I.   Plaintiff Fails to State an Imprudence Claim Based on the American Century TDFs. .... 10

        A.  Plaintiff Fails to Establish Any Meaningful Benchmarks. ......................................... 11

        B.  Even Assuming a Meaningful Benchmark, Plaintiff Does Not Allege Material, Sustained Underperformance. ...................................................................................... 18

    II.  Plaintiff Fails to State an Imprudence Claim Based on the Use of Plan Forfeitures. ....... 23

CONCLUSION................................................................................................................... 25

i

# TABLE OF AUTHORITIES

**Cases**

*Abel v. CMFG Life Ins. Co.*,
   No. 3:22-cv-00449, 2024 WL 307489 (W.D. Wisc. Jan. 26, 2024) .................................... 15, 21

*Anderson v. Intel Corp. Inv. Pol'y Comm.*,
   137 F.4th 1015 (9th Cir. 2025),
   *cert. granted*, No. 25-498, 2026 WL 120679 (Jan. 16, 2026) ........................................... 16, 22

*Anderson v. Intel Corp. Inv. Pol'y Comm.*,
   579 F. Supp. 3d 1133 (N.D. Cal. 2022)*, aff'd,* 137 F.4th 1015 (9th Cir. 2025) ...................... 17

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009)............................................................................................................... 8

*Batt v. 3M Co.*,
   No. 0:25-cv-03149, 2026 WL 674322 (D. Minn. Mar. 10, 2026)............................................ 14

*Beldock v. Microsoft Corp.*,
   No. 2:22-cv-01082, 2023 WL 3058016 (W.D. Wash. Apr. 24, 2023) .................................... 21

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007).............................................................................................................. 8

*Birse v. CenturyLink, Inc.*,
   No. 1:17-cv-02872, 2020 WL 1062902 (D. Colo. Mar. 5, 2020)............................................ 18

*Bracalente v. Cisco Sys., Inc.*,
   No. 5:22-cv-04417, 2024 WL 2274523 (N.D. Cal. May 20, 2024).......................................... 15

*Dawson v. Brookfield Asset Mgmt. LLC*,
   No. 1:25-cv-00852, 2026 WL 835553 (N.D. Ohio Mar. 26, 2026).................................... 18, 21

*Dorman v. Charles Schwab Corp.*,
   No. 4:17-cv-00285, 2019 WL 580785 (N.D. Cal. Feb. 8, 2019)............................................. 18

*EEOC v. Abercrombie & Fitch Stores, Inc.*,
   575 U.S. 768 (2015)............................................................................................................ 24

*Fifth Third Bancorp v. Dudenhoeffer*,
   573 U.S. 409 (2014).................................................................................................... 1, 4, 9

*Fitzpatrick v. Neb. Methodist Health Sys., Inc.*,
   No. 8:23-cv-00027, 2023 WL 5105362 (D. Neb. Aug. 9, 2023)................................... 5, 15, 17

*Hall v. Cap. One Fin. Corp.*,
   No. 1:22-cv-00857, 2023 WL 2333304 (E.D. Va. Mar. 1, 2023)........................................... 21

*Hughes v. Nw. Univ.*,
  595 U.S. 170 (2022)................................................................................................... 2, 9, 23

*In re Quest Diagnostics ERISA Litig.*,
  No. 24-2866, 2026 WL 1783204 (3d Cir. June 22, 2026)........................................... 16, 19, 22

*Jones v. Dish Network Corp.*,
  No. 1:22-cv-00167, 2023 WL 2644081 (D. Colo. Mar. 27, 2023).................................... 19, 21

*LaRue v. DeWolff, Boberg & Assoc.*,
  552 U.S. 248 (2008)........................................................................................................ 7

*Luckett v. Wintrust Fin. Corp.*,
  No. 1:22-cv-03968, 2024 WL 3823175 (N.D. Ill. Aug. 14, 2024).......................................... 15

*Macias v. Sisters of Charity of Leavenworth Health Sys.*,
  No. 1:23-cv-01496, 2025 WL 4095840 (D. Colo. Jan. 6, 2025) .............................................. 14

*Matney v. Barrick Gold of N. Am.*,
  80 F.4th 1136 (10th Cir. 2023) ....................................................................................... *passim*

*Matney v. Barrick Gold of N. Am., Inc.*,
  No. 2:20-cv-00275, 2022 WL 1186532 (D. Utah Apr. 21, 2022),
  *aff'd*, 80 F.4th 1136 (10th Cir. 2023)................................................................................ 9, 10

*Matousek v. MidAm. Energy Co.*,
  51 F.4th 274 (8th Cir. 2022) ........................................................................................... 11

*Meiners v. Wells Fargo & Co.*,
  898 F.3d 820 (8th Cir. 2018) ........................................................................................ *passim*

*Nolan v. Sonic Auto., Inc.*,
  No. 3:25-cv-00474, 2026 WL 1195596 (W.D.N.C. May 1, 2026).................................... 18, 21

*Patterson v. Morgan Stanley*,
  No. 16-cv-06568, 2019 WL 4934834 (S.D.N.Y. Oct. 7, 2019)................................................ 19

*Pension Benefit Guar. Corp. ex rel. St. Vincent Cath. Med. Ctr. Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.*,
  712 F.3d 705 (2d Cir. 2013).............................................................................................. 9

*Phillips v. Cobham Advanced Elec. Sols., Inc.*,
  No. 5:23-cv-03785, 2025 WL 2689268 (N.D. Cal. Sept. 19, 2025)................................. *passim*

*Pizarro v. Home Depot, Inc.*,
  111 F.4th 1165 (11th Cir. 2024), *cert. denied*, 146 S. Ct. 537 (2026)............................... 16, 23

iii

*Ramos v. Banner Health*,
461 F. Supp. 3d 1067 (D. Colo. 2020), *aff'd*, 1 F.4th 769 (10th Cir. 2021) ............................ 10

*Smith v. CommonSpirit Health*,
37 F.4th 1160 (6th Cir. 2022) ...................................................................................... *passim*

*Smith v. Shoe Show, Inc.*,
No. 1:20-cv-00813, 2022 WL 583569 n.2 (M.D.N.C. Feb. 25, 2022) ...................................... 4

*Snyder v. UnitedHealth Group, Inc.*,
No. 0:21-cv-01049, 2021 WL 5745852 (D. Minn. Dec. 2, 2021) ........................................... 17

*Wilcox v. Georgetown Univ.*,
No. 1:18-cv-00422, 2019 WL 132281 (D.D.C. Jan. 8, 2019) ........................................... 12, 20

*Wyo-Ben Inc. v. Haaland*,
63 F.4th 857 (10th Cir. 2023) ...................................................................................... *passim*

**Rules**

Fed. R. Civ. P. 12(b)(6) ............................................................................................................ 1

## SPECIFIC GROUNDS FOR REQUESTED RELIEF

Defendant FJ Management Inc. ("FJM"), by and through undersigned counsel, hereby moves to dismiss Plaintiff's Amended Class Action Complaint (Dkt. 18) ("Complaint") pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. For the reasons set forth below, the Court should dismiss the Complaint in its entirety with prejudice—including Counts I (Breach of Fiduciary Duty of Prudence under ERISA) and II (Failure to Follow Plan Terms Under ERISA)—because it fails to state any plausible claim upon which relief can be granted.

FJM respectfully requests that, upon due consideration of the motion and controlling precedent, the Court order the dismissal of the Complaint and this action with prejudice.

## INTRODUCTION

This Complaint is one of the "meritless goats" the Supreme Court warned about. *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 425 (2014). It recycles a template that Plaintiff's counsel has deployed in fourteen near-identical cases filed this year challenging the American Century target date funds ("American Century TDFs").[1] The playbook is identical: take a conservative target date fund ("TDF") series designed to manage downside risk; compare it to more aggressive, equity-heavy TDFs with different objectives; cherry-pick short timeframes in which those riskier TDFs slightly outperformed; ignore the obvious differences in strategy and risk profile that explain those results; and brand the resulting "underperformance" an ERISA breach of

---

[1] *Akey v. Big Y Foods, Inc.*, No. 3:26-cv-30098 (D. Mass.); *Benotti v. Lockton, Inc.*, No. 4:26-cv-00188 (W.D. Mo.); *Browning v. Station Casinos LLC*, No. 2:26-cv-00603 (D. Nev.); *Carter v. Sig Sauer, Inc.*, No. 1:26-cv-00098 (D.N.H.); *Chavez v. Plan Pros., LLC*, No. 3:26-02692 (D.N.J.); *Henson v. Howard Cnty. Gen. Hosp., Inc.*, No. 1:26-cv-01172 (D. Md.); *Hodges v. Wash. Reg'l Med. Sys.*, No. 5:26-cv-05070 (W.D. Ark.); *Knaggs v. Gilbane, Inc.*, No. 1:26-cv-00153 (D.R.I.); *Macey v. J.E. Dunn Constr. Co.*, No. 4:26-cv-00173 (W.D. Mo.); *McCullough-Adams v. John Hopkins Health Sys.*, No. 1:26-cv-00515 (D. Md.); *Noetling v. Ivanti, Inc.*, No. 2:26-cv-00208 (D. Utah); *Scholin v. Digi-Key Corp.*, No. 0:26-cv-01485 (D. Minn.); *Rawles v. Med. Fac. Assocs., Inc.*, No. 1:26-cv-00929 (D.D.C.); *Wakefield v. Insulet Corp.*, No. 1:26-cv-10971 (D. Mass.).

1

fiduciary duty. What these copycat complaints never allege are any facts from which the Court can infer that the fiduciary process the defendants—in this case, FJM—used to select or monitor the American Century TDFs was imprudent.

This omission is fatal. The Supreme Court has made clear that ERISA fiduciary decisions involve "difficult tradeoffs" within a "range of reasonable judgments," and that courts must give those judgments due regard at the pleading stage. *Hughes v. Nw. Univ.*, 595 U.S. 170, 177 (2022). Because these cases involve context-specific inquiries about process-based claims, plaintiffs must do more than merely allege that an investment underperformed in hindsight. Courts require allegations of a meaningful, comparable benchmark and sustained, material underperformance.

Plaintiff fails on both fronts. She offers no meaningful benchmark and no allegations of sustained, material underperformance. Rather, she insists that FJM's process was flawed because the American Century TDFs, in hindsight, trailed dissimilar, more aggressive funds at two limited snapshots in 2018 and 2019—before the proposed class period—and then "approximates" losses years later without explanation. These comparisons are invalid. They ignore fundamental differences in asset allocation, glide path, investment strategy, and risk profile. And rather than confront this mismatch, the Complaint papers over it with irrelevant metrics (e.g., Alpha, Batting Average, and Turnover Ratio) that repackage the same flaw. They change nothing. Plaintiff alleges no like-for-like comparison, no class-period performance, and no sustained, material underperformance.

Plaintiff's tack-on imprudence claim related to the use of forfeitures similarly fails. Forfeitures are non-vested employer contributions that nominally revert back to the FJ Management Inc. 401(k) Plan ("Plan") when a participant's employment ends before two or five years of service, depending on contribution type. The Complaint alleges that FJM violated ERISA by failing to use forfeitures: (i) to first defray Plan expenses—specifically, fees paid to the Plan's recordkeeper and

investment consultant—before offsetting employer contributions; and (ii) in the same year they were incurred. Plaintiff's claims are contrary to the Plan's governing documents, which: (i) require that these fees be paid by participants; and (ii) do not require that forfeitures be used in the same year they arose. Put simply, these fees did not qualify as Plan expenses eligible to be paid through forfeitures, and there is not a requirement that forfeitures be used in the year in which they occur. Accordingly, FJM's use of forfeitures complied with the Plan's requirements.

At bottom, this lawsuit—and the fourteen other strike suits like it—seeks to impose a categorical rule that selecting the conservative, risk-conscious American Century TDFs is per se imprudent based only on immaterial underperformance against dissimilar, more aggressive TDFs. This blanket attack is not about fiduciary process. It is a hindsight challenge—designed for replication across as many copycat complaints as possible—to a risk-mitigation investment strategy that is perfectly acceptable under ERISA, with a forfeiture claim added on after the fact to increase settlement pressure. The Complaint should be dismissed in its entirety.

## BACKGROUND

**The Plan.** FJM is a "Utah-based private holding company that manages a diverse portfolio of petroleum, healthcare, and hospitality-related assets." [2] Compl. ¶ 12. FJM voluntarily sponsors a comprehensive retirement program for its employees, consisting of both the Plan—a defined-contribution plan offering a diversified lineup of nearly 20 investment options—and the FJ Management Inc. Employee Stock Ownership Plan ("ESOP"), which allows employees to share in the prosperity they help generate by providing them with an ownership stake in the company. *Id.* ¶¶ 13-16. Ex. 5, 2024 Plan Form 5500 at 7; Ex. 6, 2024 ESOP Form 5500 at 5. Each year, FJM makes millions of dollars in contributions to benefit Plan participants. From 2020 through 2024, those

---

[2] FJM, *About FJ Management*, https://fjmgt.com/about/ (last visited June 26, 2026).

3

contributions totaled over $53 million. Exs. 1-5, 2020-2023 Plan Form 5500s at 6; 2024 Plan Form 5500 at 5.[3] Because of this integrated and generous approach, FJM's employees have accumulated roughly $278.6 million in Plan assets and over $372 million in total retirement savings as of year-end 2024. Compl. ¶ 19; Ex. 5, 2024 Plan Form 5500 at 5; Ex. 6, 2024 ESOP Form 5500 at 4.

This structure reflects a deliberate and balanced approach to retirement benefits. The ESOP concentrates a portion of employees' retirement savings in FJM stock, allowing them to participate directly in the company's performance.[4] The Plan, by contrast, is designed to diversify that exposure by giving employees access to a broad mix of investments so that their retirement security is not tied to a single company. Put simply, the ESOP provides upside tied to FJM' success, while the Plan provides balance and risk management. Within this framework, the American Century TDFs serve a complementary role: they take a conservative, risk-conscious approach—particularly in down markets—to help offset the ESOP's concentrated equity exposure.

Against this backdrop—and with only threadbare allegations—Plaintiff seeks to impugn the integrity of the process by which the Plan was managed with a hindsight attack on a single investment option offered in the Plan: the American Century TDFs. Compl. ¶¶ 68-129.

---

[3] In deciding a motion to dismiss, the Court may consider "matters incorporated by reference or integral to the claim, items subject to judicial notice, matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint whose authenticity is unquestioned[.]" *Wyo-Ben Inc. v. Haaland*, 63 F.4th 857, 863 (10th Cir. 2023); *see also Matney v. Barrick Gold of N. Am.*, 80 F.4th 1136, 1150 n.11 (10th Cir. 2023) (district court properly considered form 5500, trust agreement, investment policy statement, fund summary prospectuses, fund prospectuses, and industry surveys in dismissal order). Form 5500s for the Plan and ESOP are "unquestionably matters of public record," as "[t]hey are filed with the United States Department of Labor and are publicly available online." *Smith v. Shoe Show, Inc.*, No. 1:20-cv-00813, 2022 WL 583569, at *1 n.2 (M.D.N.C. Feb. 25, 2022). The Complaint also relies on the Plan's Form 5500s for 2020 through 2024 (¶¶ 146-56), which are thus "incorporated by reference" and "integral to [Plaintiff's] claim." *Wyo-Ben Inc.*, 63 F.4th at 863; *see also Matney*, 80 F.4th at 1150 n.11.

[4] Employee stock ownership plans "are 'designed to invest primarily in' the stock of the participants' employer" and need not be diversified. *Dudenhoeffer*, 573 U.S. at 416-17.

**Target Date Funds.** TDFs are not a single investment product, but a category of strategies. All TDF series offer a suite of "vintages" aligned with a participant's expected retirement year that automatically shift from growth to preservation over time. As retirement approaches, equity exposure decreases, fixed income increases, and risk is gradually reduced according to the fund's "glide path," which determines how quickly and to what extent this occurs. *Id.* ¶¶ 31-35, 37.

But the similarities end there. TDFs with the same target date can differ in fundamental ways. As both Plaintiff and the Department of Labor recognize, funds within this category can have different investment strategies, fee structures and—most critically—employ different glide paths. *Id.* ¶¶ 39, 42, 55; U.S. Dep't of Labor, *Target Date Retirement Funds - Tips for ERISA Plan Fiduciaries*, at 1 (Feb. 2013) ("TDF Tips").[5] Some follow a "to retirement" approach, reaching their most conservative allocation at the target date; others follow a "through retirement" approach, maintaining higher equity exposure beyond the target date and only becoming most conservative years later. Compl. ¶ 39; TDF Tips at 1. These distinctions are not incidental—rather, they reflect different, deliberate risk-return tradeoffs and lead to different performance outcomes. TDF Tips at 1. In short, TDFs are not interchangeable just because they share a label. *See Fitzpatrick v. Neb. Methodist Health Sys., Inc.*, No. 8:23-cv-00027, 2023 WL 5105362, at *2 (D. Neb. Aug. 9, 2023) ("[TDFs] may differ depending on their intended glide path, asset allocation, and degree to which the underlying investments are actively managed." (footnote omitted)).

The American Century TDFs reflect the conservative end of this spectrum. They employ a "to" glide path designed to reduce risk, moving out of equities more quickly than many peers and maintaining a more conservative posture in the years leading up to retirement. Compl. ¶¶ 39-40;

---

[5] https://www.dol.gov/sites/dolgov/files/EBSA/about-ebsa/our-activities/resource-center/fact-sheets/target-date-retirement-funds-erisa-plan-fiduciaries-tips.pdf.

Am. Century Invs., *One Choice® Target Date Portfolios* ("[W]e take an intentionally moderate approach. This means deliberately balancing risks to help manage losses. Sure, we could aim for the highest growth (like some other target dates), but that could also expose *you* to greater risks and higher losses.").[6] This deliberate choice has predictable outcomes. The American Century TDFs may capture less upside than more aggressive funds during strong equity markets, but they are designed to hold up better in downturns and deliver steadier risk-adjusted returns over time. *Id.* In the context of a retirement plan—especially one already including concentrated equity exposure through an ESOP—that is not a flaw. It is a feature.

Plaintiff's comparators take the opposite approach. The TDFs offered by American Funds, Vanguard, T. Rowe Price, and BlackRock (collectively, the "Comparator TDFs") generally maintain higher equity exposure and pursue more aggressive glide paths aimed at maximizing returns. These differences affect performance. In simple terms, the Comparator TDFs chase higher returns while remaining exposed to greater downside risk; the American Century TDFs trade upside for greater downside protection. The following chart summarizes the core structural differences between the American Century and Comparator TDFs.[7]

---

[6] https://www.americancentury.com/invest/accounts/one-choice-portfolios/target-date/ (last visited June 24, 2026).

[7] Compl. ¶ 69 (American Century TDFs' glide path and investment strategy), ¶ 74 (American Funds TDFs' glide path and investment strategy), ¶ 75 (Vanguard TDFs' glide path), ¶ 76 (T. Rowe Price TDFs' glide path and investment strategy), ¶ 77 (BlackRock TDFs' glide path); Ex. 7, Morningstar 2022 Target-Date Strategy Landscape at 2 (Vanguard and BlackRock TDFs' investment strategy). The Complaint relies on this Morningstar publication (¶¶ 40 n.5, 74), which is thus "incorporated by reference" and "integral to [Plaintiff's] claim." *Wyo-Ben Inc.*, 63 F.4th at 863; *see also Matney*, 80 F.4th at 1150 n.11.

6

| TDFs | Asset Allocation[8] (Equity/Bond) | Glide Path | Investment Strategy[9] | Risk Profile |
|---|---|---|---|---|
| American Century | 71.2/22.5 | To | Active | Conservative |
| American Funds | 81.7/10.1 | Through | Active | Aggressive |
| Vanguard | 88.7/9.8 | Through | Passive | Aggressive |
| T. Rowe Price | 88.2/8.1 | Through | Active | Aggressive |
| BlackRock | 93.0/5.3 | To | Passive | Aggressive |

**Forfeitures.** Like other 401(k) plans, FJM employees who participate in the Plan have individual accounts, which they contribute to through salary deferrals. *See LaRue v. DeWolff, Boberg & Assoc.*, 552 U.S. 248, 250 n.1, 255 (2008) (discussing attributes of 401(k) and other "individual account" plans). Plan participants are immediately "vested" in the contributions they make to their individual accounts, meaning that they keep those contributions (and associated investment earnings) even if they leave FJM to go work for another company. Ex. 8, Plan Document at 73-76 (Article IX); Ex. 9, Adoption Agreement at 50-52 (Article IX).[10]

This case is about the additional discretionary contributions and matching contributions (collectively, "Employer Contributions") that FJM voluntarily elects to make to Plan participants' accounts each year. Discretionary contributions are made pro-rata "[i]n the same ratio that each [p]articipant's [c]ompensation bears to the total [c]ompensation of all [p]articipants." Ex. 9, Adoption Agreement at 32. Matching contributions total 100% of the first 2% of eligible compensation

---

[8] 2045 vintage as of quarter one 2020. Appendix B shows the asset allocations for all vintages.

[9] Actively managed funds use portfolio managers to buy and sell stocks in an effort to outperform the market. *Matney*, 80 F.4th at 1150 n.10. Passively managed funds track an established market index, and the portfolio manager does not make any independent choices. *Id.* As a result, "they are generally less expensive than actively managed funds." *Id.*

[10] The Complaint relies on the Plan Document and Adoption Agreement (¶¶ 133-44), which are thus "incorporated by reference" and "integral to [Plaintiff's] claim." *Wyo-Ben Inc.*, 63 F.4th at 863; *see also Matney*, 80 F.4th at 1150 n.11.

7

deferred by each employee, plus 50% of the next 4% of eligible compensation deferred by each employee, not to exceed 4% of an employee's total compensation. *Id.* at 49.

FJM's Employer Contributions are not immediately vested, but vest over time. Discretionary contributions vest at a rate of 20% per year of credited service for a period of five years. *Id.* at 51-52. Matching contributions are 100% vested after two years of credited service. *Id.* In other words, a participant must work five years for discretionary contributions to fully vest, and two years for matching contributions to fully vest. *Id.* If a participant's employment ends before doing so, he or she forfeits the unvested portion of the Employer Contributions in their account, which revert nominally back to the Plan. Ex. 8, Plan Document at 19.

After forfeitures are "used to restore previously forfeited amounts" to participant accounts (e.g., a participant who leaves employment with FJM but returns within a certain timeframe, a point not challenged in the Complaint), the Adoption Agreement states that forfeitures should be used: (i) "first to offset Plan expenses"; (ii) "to reduce future [m]atching [c]ontributions"; and (iii) "to reduce future [n]onelective [c]ontributions." Ex. 9, Adoption Agreement at 52. The Adoption Agreement also provides that forfeitures do not need to be used in the same year in which they arose. *Id.*

Importantly, the Plan Document requires that "all reasonable expenses incurred in the administration of the Plan" that are not paid by FJM "shall be paid from the [p]articipants' [a]ccounts to which such expenses are allocable." Ex. 8, Plan Document at 105.

**LEGAL STANDARD**

To survive a motion to dismiss under Rule 12(b)(6), a complaint must allege facts that, accepted as true, "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Allegations that merely invite speculation or rest on conclusory assertions do not suffice. *See Twombly*, 550 U.S.

8

at 555. Nor must courts accept legal conclusions or factual assertions contradicted by the complaint itself or materials properly considered at the pleading stage. *Matney*, 80 F.4th at 1144-45.

These principles carry particular force in ERISA cases. Because the prospect of burdensome discovery can exert substantial settlement pressure on even the weakest of claims, *Pension Benefit Guar. Corp. ex rel. St. Vincent Cath. Med. Ctr. Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 718-19 (2d Cir. 2013), courts apply a "careful, context-sensitive scrutiny" to ensure that a complaint plausibly alleges a fiduciary breach before allowing it to proceed. *Dudenhoeffer*, 573 U.S. at 425. This scrutiny reflects a further reality: fiduciary decision making in this context necessarily involves tradeoffs among competing, reasonable approaches. That is why the Supreme Court has instructed courts to "give due regard to the range of reasonable judgments a fiduciary may make based on her experience and expertise." *Hughes*, 595 U.S. at 177.

Against this backdrop, hindsight comparisons or disagreement with one reasonable approach over another, without more, do not cross the line from a possible claim to a plausible claim. *See id.*; *Matney v. Barrick Gold of N. Am., Inc.*, No. 2:20-cv-00275, 2022 WL 1186532, at *3 (D. Utah Apr. 21, 2022), *aff'd*, 80 F.4th 1136 (10th Cir. 2023).

## **ARGUMENT**

Count I asserts—based only on backward-looking performance—that FJM breached its fiduciary duty by failing to monitor the American Century TDFs. But this allegation rests on the sleight of hand described above: it treats deliberately opposed investment strategies as interchangeable and then faults FJM for selecting one that prioritizes downside protection over return maximization. Unsurprisingly, this choice meant that the American Century TDFs at times trailed Plaintiff's more aggressive, equity-heavy Comparator TDFs in certain market environments, but any such underperformance was episodic and immaterial. Compl. ¶¶ 100, 114, 179-90. Count II claims that FJM breached its fiduciary duty by not using forfeitures in accordance with the Plan's

9

governing documents. This theory is similarly flawed. The only expenses Plaintiff points to are required by the Plan Document to be paid by participants—and thus, do not qualify as Plan expenses to which forfeitures may be applied—and the Adoption Agreement does not require that forfeitures be used in the same year they arose. *Id.* ¶¶ 191-200.

**I.    Plaintiff Fails to State an Imprudence Claim Based on the American Century TDFs.**

Plaintiff claims that FJM breached its fiduciary duty by failing to remove the allegedly underperforming American Century TDFs from the Plan by "early 2020." *Id.* ¶¶ 88-129. But ERISA does not permit second-guessing fiduciaries based on outcomes alone. Instead, imprudence turns on a fiduciary's process "viewed from the perspective of the time of the challenged decision rather than from the vantage point of hindsight." *Ramos v. Banner Health*, 461 F. Supp. 3d 1067, 1123 (D. Colo. 2020), *aff'd*, 1 F.4th 769 (10th Cir. 2021); *see also Matney*, 2022 WL 1186532, at *4 (similar). This is because ERISA "requires prudence, not prescience." *Matney*, 80 F.4th at 1146.

Plaintiff alleges zero facts about FJM's process, so she must instead provide a "[]sufficient factual basis to support a reasonable inference of imprudence." *Id.* at 1155. In other words, she must allege enough facts from which "the court can infer . . . that the fiduciary's decision[-]making process was flawed." *Matney*, 2022 WL 1186532, at *4. Pointing to allegedly underwhelming investment performance is not enough. *See Matney*, 80 F.4th at 1148 (adopting the Eighth Circuit's "approach to an ERISA plaintiff's pleading burden"). To move a claim of underperformance from possible to plausible, a plaintiff must allege that the challenged fund underperformed relative to a "sound basis for comparison—a meaningful benchmark"—such that no prudent fiduciary in like circumstances would have offered the challenged fund. *Id.* at 1147 (quoting *Meiners v. Wells Fargo & Co.*, 898 F.3d 820, 822 (8th Cir. 2018)). Otherwise, a plaintiff could evade dismissal simply by pointing to any fund that, in hindsight, performed better—even one pursuing a different strategy.

Even if a plaintiff properly identifies comparators with similar holdings, investment strategies, and risk profiles, *see Matney*, 80 F.4th at 1148, he or she must still allege sustained, material underperformance: "a showing of imprudence [does not] come down to simply pointing to a fund with better performance." *Smith v. CommonSpirit Health*, 37 F.4th 1160, 1166 (6th Cir. 2022); *see also Meiners*, 898 F.3d at 823 ("No authority requires a fiduciary to pick the best performing fund."). Otherwise, ordinary market variation—particularly across funds making different, but reasonable, risk tradeoffs—would become a basis for federal litigation.

Plaintiff satisfies none of these requirements. She pleads no facts about process, no meaningful benchmark, and no sustained or material underperformance. Instead, she offers hindsight performance comparisons to dissimilar, more aggressive TDFs cherry-picked from two brief periods before the proposed class period and then extrapolates unexplained "losses" years later. Compl. ¶¶ 95-96. This does not support a plausible inference of imprudence; it is speculation dressed as analysis. Without allegations that tie performance to a flawed fiduciary process, the Complaint does not cross the line from possible to plausible. It should be dismissed.

### A.  Plaintiff Fails to Establish Any Meaningful Benchmarks.

Plaintiff fails at requirement one: she does not plead a meaningful benchmark, as the Tenth Circuit requires. The Complaint contains no facts showing that the Comparator TDFs "have similar investment strategies, similar investment objectives, or similar risk profiles" as the American Century TDFs—the facts needed to establish a "sound basis for comparison." *Matney*, 80 F.4th at 1148; *see also Matousek v. MidAm. Energy Co.*, 51 F.4th 274, 281 (8th Cir. 2022) (similar). In fact, Plaintiff alleges just the opposite. The Complaint acknowledges that: (i) three of her four comparators (the American Funds, Vanguard, and T. Rowe Price TDFs) have a "through" glide path, while the American Century TDFs have a "to" glidepath; and (ii) two of her four comparators (the Vanguard and BlackRock TDFs) have passive investment strategies, while the American

11

Century TDFs have an active investment strategy. *See supra* at p. 7.[11] The Tenth Circuit has rejected such apples to oranges comparisons between TDFs with different glide paths and investment strategies as insufficient to establish a meaningful benchmark. *Matney*, 80 F.4th at 1152-54, n.14.

The only attempt Plaintiff makes to show that the Comparator TDFs are meaningful benchmarks is her claim that they have "similar risk and asset-allocation characteristics" as the American Century TDFs at "the date of retirement." Compl. ¶¶ 72-78. But this allegation does not move the needle—the American Century and Comparator TDFs have materially different asset allocations and risk profiles for the ***forty years*** predating the retirement date, rendering them inapt comparators. *See infra* at p. 13 (Appendix B).[12] Indeed, the American Century TDFs have the lowest allocation to equities and highest allocation to bonds for ***every vintage*** other than the one Plaintiff cherry-picked with the hopes of manufacturing a meaningful benchmark. As the Complaint recognizes, a lower allocation to equities and higher allocation to bonds means less risk and an investment strategy "more focused on preservation" than "growth," and vice versa. Compl. ¶ 37.

---

[11] Plaintiff attempts to hide the fact that the Vanguard and BlackRock TDFs use passively managed underlying investments by simply omitting this information from the Complaint (despite including similar information for her other two comparators and the American Century TDFs). But Plaintiff's own source includes this "missing" information. *See supra* at p. 6, n.7.

[12] Appendix B contains asset allocation data for quarter one 2020 that is publicly accessible via Morningstar. The Complaint, relying on Morningstar, includes allegations about asset allocation as of that date. Compl. ¶¶ 72-78. Accordingly, the Court may consider Appendix B, as it contains information that is "incorporated by reference or integral to the claim," "subject to judicial notice," and/or a "matter[] of public record." *Wyo-Ben Inc.*, 63 F.4th at 863; *see also Smith*, 37 F.4th at 1168 ("The district court fairly considered [] more recent [Morningstar] data because it was central to [plaintiff's] claim, publicly available, and judicially noticeable."); *Wilcox v. Georgetown Univ.*, No. 1:18-cv-00422, 2019 WL 132281, at *4 n.5 (D.D.C. Jan. 8, 2019) ("The Court also takes judicial notice of publicly available definitions and information on the various funds available through Morningstar, a well-respected investment research firm."); *Matney*, 80 F.4th at 1150 n.11.

**American Century TDFs vs. Comparator TDFs**
**Equity and Bond Allocations (% of assets)**
As of March 31, 2020

| | | Income | 2020 | 2025 | 2030 | 2035 | 2040 | 2045 | 2050 | 2055 | 2060 | 2065 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **American Century (CIT I)** | **Equity** | **43.2** | **-** | **48.0** | **52.9** | **58.8** | **64.8** | **71.2** | **77.7** | **80.6** | **83.0** | **-** |
| | **Bond** | **48.9** | **-** | **43.3** | **38.7** | **33.3** | **27.9** | **22.5** | **17.0** | **14.6** | **12.5** | **-** |
| American Funds (MF R6) | Equity | - | 43.0 | 52.8 | 62.0 | 75.3 | 80.2 | 81.7 | 83.1 | 83.1 | 83.1 | 83.1 |
| | Bond | - | 49.4 | 39.7 | 30.6 | 16.9 | 11.7 | 10.1 | 8.7 | 8.6 | 8.6 | 8.6 |
| BlackRock LifePath Index (Trust T) | Equity | 37.8 | - | - | 62.5 | 74.1 | 84.8 | 93.0 | 97.0 | 97.5 | 97.5 | 97.6 |
| | Bond | 57.1 | - | - | 33.8 | 23.0 | 12.9 | 5.3 | 1.6 | 1.2 | 1.2 | 1.1 |
| T. Rowe Price Ret (CIT Trust A) | Equity | - | 54.0 | 63.5 | 71.4 | 78.0 | 83.5 | 88.2 | 90.0 | 90.5 | 90.6 | - |
| | Bond | - | 40.9 | 32.0 | 24.0 | 18.1 | 12.9 | 8.1 | 6.0 | 6.3 | 6.1 | - |
| Vanguard Tgt Ret (CIT Trust II) | Equity | 29.9 | 49.8 | 59.5 | 66.9 | 74.3 | 81.8 | 88.7 | 88.7 | 88.6 | 88.6 | 88.7 |
| | Bond | 67.0 | 47.8 | 38.6 | 31.3 | 24.0 | 16.7 | 9.8 | 9.9 | 9.9 | 9.9 | 9.9 |

Source: Morningstar

Note: Missing data indicates that the vintage either (1) is not offered by the TDF suite (e.g. Income vintages for certain 'through' retirement TDFs), (2) has merged into the Income vintage, or (3) was launched after March 31, 2020.

The reason why Plaintiff omitted this information is simple: the complete picture shows that the American Century TDFs are conservative, risk-conscious funds, while the TDFs she prefers are more aggressive and equity-heavy. *See supra* at pp. 7, 13. These differences go to the core of how the funds are constructed and what they are designed to do. This makes Plaintiff's comparators inapt, as the Northern District of California recently recognized in dismissing a similar challenge to the American Century TDFs. *See Phillips v. Cobham Advanced Elec. Sols., Inc.*, No. 5:23-cv-03785, 2025 WL 2689268, at *2, *5-7 (N.D. Cal. Sept. 19, 2025) (rejecting comparison of the American Century TDFs to other TDFs—including the same American Funds and T. Rowe Price TDFs Plaintiff points to here—with similar differences in asset allocation, which "reflect fundamentally different investment strategies and risk preferences").

Absent allegations identifying comparators with similar holdings, investment strategies, and risk profiles, courts routinely reject TDF lawsuits for lack of meaningful benchmarks at the motion to dismiss stage. *See, e.g.*, *Matney*, 80 F.4th at 1152-54, n.14 (affirming dismissal for failure to provide a meaningful benchmark where comparators had "materially different investment strategies" due to differences in glide path and use of active versus passive underlying funds); *Meiners*, 898 F.3d at 823-25 (the "omission of any meaningful benchmark" left only the fact that a fund with a "different investment strategy ultimately performed better," which "does not establish anything" about prudence (footnote omitted)); *Smith*, 37 F.4th at 1167 (comparators "inapt" because each fund had "distinct goals and distinct strategies"); *Anderson v. Intel Corp. Inv. Pol'y Comm.*, 137 F.4th 1015, 1023 (9th Cir. 2025) (comparators not "truly comparable" given "different aims, different risks, and different potential rewards"), *cert. granted*, No. 25-498, 2026 WL 120679 (Jan. 16, 2026); *Batt v. 3M Co.*, No. 0:25-cv-03149, 2026 WL 674322, at *6 (D. Minn. Mar. 10, 2026) (same); *Macias v. Sisters of Charity of Leavenworth Health Sys.*, No. 1:23-cv-

01496, 2025 WL 4095840, at *6 (D. Colo. Jan. 6, 2025) (lack of "factual allegations concerning [] management styles," i.e., "active, passive, or some combination of the two, . . . preclude[d] a finding that the selected comparators allow for an apples-to-apples comparison"); *Fitzpatrick*, 2023 WL 5105362, at *7 (rejecting claim where complaint failed to plead comparator characteristics, leaving "the composition of the peer groups" a "mystery").

Recognizing that the Complaint's allegations fall well short of pleading a meaningful benchmark, Plaintiff advances three justifications for why her comparisons are appropriate despite key differences between the American Century and Comparator TDFs in asset allocation, glide path, investment strategy, and risk profile. None have merit.

***First***, Plaintiff asserts that, because the universe of TDFs is limited, fiduciaries must evaluate options against "market leading and established" alternatives when selecting or retaining a TDF series—even if those funds differ in design and risk profile—as evidenced by the fact that FJM and other retirement plan fiduiciaries replaced the American Century TDFs with TDF series with different characteristics. Compl. ¶¶ 49, 67, 69. But that is not the law. As multiple courts have recognized, market prominence is not a proxy for comparability. *See Abel v. CMFG Life Ins. Co.*, No. 3:22-cv-00449, 2024 WL 307489, at *5 (W.D. Wisc. Jan. 26, 2024) (rejecting plaintiffs' allegation that their comparators were meaningful benchmarks simply because "'they represent the most likely alternatives' due to their market share"); *Bracalente v. Cisco Sys., Inc.*, No. 5:22-cv-04417, 2024 WL 2274523, at *8 (N.D. Cal. May 20, 2024) (similar). Additionally, the "assessment that fiduciaries must do to select [and monitor] a product is different from the comparison courts must do" in evaluating plausibility; courts "cannot, and should not, compare apples to oranges when determining a meaningful benchmark for performance." *Luckett v. Wintrust Fin. Corp.*, No. 1:22-cv-03968, 2024 WL 3823175, at *4 (N.D. Ill. Aug. 14, 2024).

This is exactly what Plaintiff asks this Court to do—compare apples to oranges. The American Century TDFs and her preferred comparators differ in ways that matter: asset allocation, glide path, investment strategy, and risk profile. *See supra* at p. 7. These are not minor variations; they define what the funds are designed to do. The Complaint glosses over these differences, but the courts do not. As the Tenth Circuit has recognized, funds with different strategies "have different aims, different risks, and different potential rewards," and comparing them proves nothing. *Matney*, 80 F.4th at 1153. The same is true here: pointing to funds pursuing different objectives "does not establish anything" about prudence. *Id.* at 1148 (quoting *Meiners*, 898 F.3d at 823). Other circuit courts have said the same in this context—TDFs with different glide paths, allocations, and objectives are simply not comparable. *See, e.g.*, *In re Quest Diagnostics ERISA Litig.*, No. 24-2866, 2026 WL 1783204, at *4 (3d Cir. June 22, 2026); *Anderson*, 137 F.4th at 1024; *Pizarro v. Home Depot, Inc.*, 111 F.4th 1165, 1180 (11th Cir. 2024), *cert. denied*, 146 S. Ct. 537 (2026); *Smith*, 37 F.4th at 1167; *Meiners*, 898 F.3d at 823-25.

**Second**, Plaintiff argues that these differences do not matter because "American Century itself has marketed the [American Century] TDFs by comparing its series to those of its competitors" with different glide paths. Compl. ¶ 83. This characterization is entirely out of context. American Century contrasts the American Century TDFs with an "aggressive competitor"—the American Funds TDFs and a TDF series offered by Fidelity ("Fidelity TDFs")—to illustrate how the American Century TDFs' conservative, risk-conscious investment strategy holds up versus TDFs with aggressive, equity-heavy investment strategies over a full market cycle (i.e., both upward and downward markets). Indeed, the sources cited in the Complaint (¶ 83 n.17, n.18) not only confirm that there are material differences between the American Century TDFs and the American Funds and Fidelity TDFs, but they also render Plaintiff's claim of underperformance implausible. They

16

show that the American Century TDFs outperformed the American Funds TDFs—Plaintiff's best-performing comparator in 2018 and 2019—from November 1, 2007 through June 30, 2024 and the Fidelity TDFs from November 1, 2007 through March 31, 2026 based on actual returns and risk-adjusted returns (Sharpe Ratio) while taking less risk and capturing less downside (i.e., losses during market downturns). Exs. 10-11, Am. Century OneChoice Target Date Portfolios at 8-9.

*Third*, Plaintiff points to the fact that the American Century and Comparator TDFs are "in the same Morningstar Category" as evidence that they are "peer-comparable for purposes of performance, risk, and asset-allocation analysis." Compl. ¶¶ 80-82. But Morningstar's justification for doing so, according to the Complaint, is based on "goals and features that are common to *all* TDFs." *Anderson v. Intel Corp. Inv. Pol'y Comm.*, 579 F. Supp. 3d 1133, 1150 (N.D. Cal. 2022) (emphasis added), *aff'd*, 137 F.4th 1015 (9th Cir. 2025). Accordingly, this amounts to an "argument that all TDFs are meaningful benchmarks," which "cannot survive a motion to dismiss." *Id.*; *see also Phillips*, 2025 WL 2689268, at *6 (rejecting "insufficient allegations" that comparators for the American Century TDFs were meaningful benchmarks" based on "features [] common to most, if not all, [TDFs]").[13]

The Comparator TDFs thus fail to "provide a sound basis for comparison—a meaningful benchmark." *Matney*, 80 F.4th at 1147. Plaintiff's imprudence claim fails for this reason alone.

---

[13] The Complaint's reliance on *Snyder v. UnitedHealth Group, Inc.*, No. 0:21-cv-01049, 2021 WL 5745852 (D. Minn. Dec. 2, 2021) is misplaced. Compl. ¶ 82. That case was "decided before the Eighth Circuit's decision in *Matousek*[,] which provides a more-detailed analysis." *Fitzpatrick*, 2023 WL 5105362, at *7 n.8. *Snyder* is also distinguishable; unlike here, the plaintiffs' comparators had "similar purposes, asset allocations and risk exposure as the [challenged] TDF." *Snyder*, 2021 WL 5745852, at *4.

**B. Even Assuming a Meaningful Benchmark, Plaintiff Does Not Allege Material, Sustained Underperformance.**

Even if the Court accepted Plaintiff's benchmarks, the Complaint still fails. Plaintiff alleges that the American Century TDFs underperformed the Comparator TDFs by 2.97% at most—and often far less—during two arbitrary snapshots predating her proposed six-year class period. *See* App. A; Compl. ¶¶ 19, 88-129; Dkt. 18-1. This is not the type of sustained, material underperformance that supports a plausible inference of imprudence.

Start with Plaintiff's timeframe. She does not allege sustained underperformance—only a transient gap, based on three- and five-year trailing averages reported in 2018 and 2019, that falls outside the proposed class period. This is not enough. Courts routinely reject allegations of underperformance spanning **three to five years** as "relatively short periods of underperformance." *Birse v. CenturyLink, Inc.*, No. 1:17-cv-02872, 2020 WL 1062902, at *6 (D. Colo. Mar. 5, 2020) (quoting *Dorman v. Charles Schwab Corp.*, No. 4:17-cv-00285, 2019 WL 580785, at *3, *6 (N.D. Cal. Feb. 8, 2019) (allegations that a fund "persistently and/or materially underperformed" for three to five years did not support an inference of imprudence)); *see also Dawson v. Brookfield Asset Mgmt. LLC*, No. 1:25-cv-00852, 2026 WL 835553, at *18 (N.D. Ohio Mar. 26, 2026) (allegations that the American Century TDFs underperformed in 2019, 2021, 2023, and 2024 were insufficient: "[s]uch a small window of time cannot plausibly establish imprudence"); *Nolan v. Sonic Auto., Inc.*, No. 3:25-cv-00474, 2026 WL 1195596, at *8 (W.D.N.C. May 1, 2026) (three-year underperformance "by as much as 7.03% . . . is insufficient to plausibly allege imprudence").

This is particularly true for a long-term investment like a TDF: "[m]erely pointing to another investment that has performed better in a five-year snapshot of the lifespan of a fund that is supposed to grow for fifty years does not suffice to plausibly plead an imprudent decision." *Smith*, 37 F.4th at 1166. Under Plaintiff's view, "disappointing short-term losses" should prompt

18

fiduciaries to "[p]recipitously sell[] a well-constructed portfolio," a course of action that is "one of the surest ways to frustrate the long-term growth of a retirement plan." *Id.*

But ERISA imposes no such duty to chase recent winners. Fiduciaries are not required to "reflexively jettison investment options in favor of the prior year's top performers." *Jones v. Dish Network Corp.*, No. 1:22-cv-00167, 2023 WL 2644081, at *7 (D. Colo. Mar. 27, 2023) (quoting *Patterson v. Morgan Stanley*, No. 16-cv-06568, 2019 WL 4934834, at *11 (S.D.N.Y. Oct. 7, 2019)); *see also Meiners*, 898 F.3d at 823. Rather, "a fiduciary may—and often does—retain investments through a period of underperformance as part of a long-range investment strategy." *Jones*, 2023 WL 2644081, at *7. That is why only sustained, material underperformance—i.e., "consistent, ten-year underperformance" that is "substantial"—can support a plausible imprudence claim. *Patterson*, 2019 WL 4934834, at *10. As the Third Circuit explained just last week, fiduciaries would otherwise be required "to cut every below-average fund" to chase returns, "creat[ing] chaos." *In re Quest*, 2026 WL 1783204, at *4 ("[m]inor underperformance" during two-year period "does not require immediate change"; only "severe and sustained" underperformance implicates imprudence).

Plaintiff comes nowhere close to meeting this standard. She does not allege sustained underperformance—let alone underperformance approaching ten years—and, in fact, alleges nothing about the American Century TDFs' performance from 2020 onward, other than one quarter return in 2020 for a single cherry-picked vintage. Compl. ¶ 72. This omission is striking given that she purports to calculate "approximate performance losses" through December 2024. *Id.* ¶ 95. Rather than use ***actual*** performance, Plaintiff ***extrapolates*** performance (despite readily available actual performance) from her 2018 and 2019 snapshots before the proposed class period to "approximate"

19

continued underperformance through 2024. *Id*. This is not a plausible allegation of sustained, material underperformance; it is speculation layered on hindsight.

Plaintiff omitted post-2019 performance data not because she overlooked it, but because it refutes her theory. As of the first quarter of 2020—the very moment at which, according to Plaintiff, the need to replace the American Century TDFs was first apparent—a majority of the funds' vintages were outperforming their Comparator TDF counterparts across one-, three-, five-, and ten-year trailing returns. *See* App. C.[14] And this was no temporary blip. As of year-end 2022, a majority of American Century TDF vintages were still outperforming the corresponding Comparator TDF vintages based on one-, three-, five-, and ten-year trailing returns. *See* App. D.[15] As the Northern District of California recognized in dismissing a similar challenge to the American Century TDFs, they "outperformed more than half of the TDFs in their [Morningstar] peer group" in 2018, 2020, and 2022—a "track record [that] does not permit an inference" of imprudence. *Phillips*, 2025 WL 2689268, at *5.

But even accepting Plaintiff's cherry-picked timeframe and mismatched comparators on their own terms, her allegations still fail. Her own charts show that the alleged "underperformance" is immaterial: just 0.76% to 2.97% for three-year trailing returns, and just 0.36% to 2.26% for five-

---

[14] Appendices C and D contain performance data for quarter one 2020 and year-end 2022 that is publicly accessible via Morningstar. Plaintiff relies on the same performance data for quarter one 2020 (but cherry-picks a single vintage), and the Complaint discusses the American Century TDFs' performance during this timeframe. Compl. ¶¶ 92, 95, 102. Accordingly, the Court may consider Appendices C and D, as they contain information that is "incorporated by reference or integral to the claim," "subject to judicial notice," and/or a "matter[] of public record." *Wyo-Ben Inc.*, 63 F.4th at 863; *see also Matney*, 80 F.4th at 1150 n.11; *Smith*, 37 F.4th at 1168; *Wilcox*, 2019 WL 132281, at *4 n.5.

[15] For the minority of American Century TDF vintages that did not outperform the corresponding vintages of the Comparator TDFs as of the first quarter of 2020 and year-end 2022, the differences in performance are not material as a matter of law. *See infra* at p. 21.

year trailing returns, depending on vintage. *See* App. A; Dkt. 18-1.[16] Just months ago, the Northern District of Ohio rejected "such modest underperformance" by the American Century TDFs as "insufficient to infer imprudence." *Dawson*, 2026 WL 835553, at \*19. Indeed, the alleged underperformance in *Dawson* was **even greater** than the underperformance alleged here. *See id.* at \*18 ("[T]he range of outperformance generally was between less than 1% and 3%, and never exceeding 4%."). Courts across the country agree. *See, e.g.*, *Jones*, 2023 WL 2644081, at \*7 (underperformance "by 1% to 3.5%" based on "three- and five-year annualized returns" was "insufficient to show . . . an imprudent monitoring process"); *Abel*, 2024 WL 307489, at \*5 ("[U]nderperformance during three and five-year periods . . . ranging from 0.2% to around 5%, with the average underperformance being between 1 and 3%," was "not enough to carry plaintiffs' [imprudence] claims . . . past the pleading threshold.") (collecting cases finding "short-term differences in performance of between 1.14 to 4.4% immaterial"); *Nolan*, 2026 WL 1195596, at \*8 (underperformance "by as much as 7.03% between 2017 and 2019 . . . is insufficient to plausibly allege imprudence").

Recognizing the weakness of her underperformance allegations, Plaintiff stuffs her Complaint with exotic performance metrics, hoping to get by on volume rather than substance. Compl. ¶¶ 58-59, 94. Courts have rejected this tactic repeatedly—including in recent lawsuits challenging the American Century TDFs. *See Dawson*, 2026 WL 835553, at \*11, \*20 (rejecting "turnover ratio" allegations); *Phillips*, 2025 WL 2689268, at \*7 (rejecting "Beta ratings" allegations). This is because such metrics "do[] not alter the analysis," as they are "merely additional measurements of investment performance" and "therefore immaterial." *Hall v. Cap. One Fin. Corp.*, No. 1:22-cv-00857, 2023 WL 2333304, at \*6 (E.D. Va. Mar. 1, 2023); *see also Beldock v. Microsoft Corp.*,

---

[16] Appendix A contains performance data from Appendix A to the Complaint (Dkt. 18-1) that is simply presented more conveniently for comparison.

No. 2:22-cv-01082, 2023 WL 3058016, at *3 (W.D. Wash. Apr. 24, 2023) (same). As Plaintiff herself recognizes, "the actual performance of an investment is the most important criteria to the investor (plan participant)," Compl. ¶ 57—i.e., whether the funds delivered returns consistent with their strategy—not a scattershot of alternative metrics simply repackaging the same performance data into an arbitrary and flawed pass/fail test. Indeed, her attempt to distill prudence into a quantitative dashboard of metrics calculated over short periods would lead to ill-advised performance chasing and "create chaos." *In re Quest*, 2026 WL 1783204, at *4.

Even if these metrics mattered, however, they render less plausible Plaintiff's claim. For example, the Complaint alleges that "[a] positive Alpha indicates the portfolio has performed better than its beta would predict," while "a negative Alpha indicates the portfolio has underperformed[.]" Compl. ¶ 58. Yet several American Century TDF vintages posted positive Alphas in 2018 and 2019. *See* Dkt. 18-1 at 4, 6, 8, 10, 12, 14. In other words, they outperformed expectations. The same is true for "Batting Average," which the Complaint says measures a manager's ability to beat the market. Compl. ¶ 59. The American Century TDFs' 5-year batting averages ranged from .433 to .517—meaning they matched or exceeded the market 43% to nearly 52% of the time. Dkt. 18-1 at 2, 4, 6, 8, 10, 12. These metrics do not support Plaintiff's theory—they refute it.[17]

At bottom, Plaintiff challenges the American Century TDFs' conservative investment strategy. But ERISA fiduciaries need not "adopt a riskier strategy simply because that strategy may increase returns." *Anderson*, 137 F.4th at 1024; *see also Reetz v. Lowe's Cos.*, No. 5:18-cv-00075,

---

[17] Plaintiff's risk-adjusted performance metrics also fail to remedy the Complaint's lack of a meaningful benchmark—"an ERISA plaintiff cannot make incomparable funds comparable simply by using a ratio" to risk-adjust performance returns. *Anderson*, 137 F.4th at 1025. Rather, such metrics "only speculate[] that if a fund with a comparable risk profile had followed the trend of other, presumably riskier, funds, it would have generated higher returns," rather than actually identifying comparable alternative funds in the marketplace. *Id.*

2021 WL 4771535, at *56 (W.D.N.C. Oct. 12, 2021) ("ERISA does not require fiduciaries to chase returns or prioritize [] returns over other considerations, including the higher risk associated with higher expected returns."), *aff'd sub nom.*, *Reetz v. Aon Hewitt Inv. Consulting, Inc.*, 74 F.4th 171 (4th Cir. 2023). Rather, fiduciaries may choose from a "range of reasonable judgments," *Hughes*, 595 U.S. at 177, as *all* investment strategies entail tradeoffs:

> In years when the equity market is hot, a more aggressive [TDF] that retains equities longer will appear to outperform a fund that shifts toward more conservative assets like bonds sooner. But that snapshot does not mean it is objectively imprudent to adopt a more conservative strategy—the tables turn when the market is down.

*Pizarro*, 111 F.4th at 1180.

"[T]his is 'precisely the tradeoff' that [Defendant] anticipated": the American Century TDFs "were generally more insulated from market volatility and performed better during down markets, at the expense of missing some potential upside." *Phillips*, 2025 WL 2689268, at *7. Plaintiff may prefer a different approach, but "[t]he Court 'must give due regard'" to Defendant's decision "to mitigate risk." *Id.* Plaintiff's imprudence claim should be dismissed.

## II.    Plaintiff Fails to State an Imprudence Claim Based on the Use of Plan Forfeitures.

Plaintiff also claims that FJM breached its fiduciary duty by failing to follow the terms of the Plan's governing documents regarding the use of forfeitures. Compl. ¶¶ 130-56, 191-200. Neither of her theories survives even the slightest of scrutiny.

***First***, the Complaint alleges that FJM failed to use forfeitures to first defray Plan expenses before offsetting employer contributions. *Id.* ¶¶ 145-48, 151-56. Relying on the Plan's Form 5500s, Plaintiff purports to identify two such expenses that were not paid with forfeitures: (i) fees paid to the Plan's recordkeeper; and (ii) fees paid to the Plan's investment consultant. *Id.*[18] But there is

---

[18] Plaintiff does not state that the alleged Plan expenses are attributable to these fees, but the amounts listed in the Complaint for Plan expenses paid (¶147) correspond with the amounts listed

one key detail that she misses—these fees are *participant* expenses, not *Plan* expenses. The Plan Document makes this clear: "all reasonable expenses incurred in the administration of the Plan" that are not paid by FJM "shall be paid from the [p]articipants' [a]ccounts to which such expenses are allocable"—"without limitation." Ex. 8, Plan Document at 105.[19] Accordingly, not only were the expenses that Plaintiff identifies *not* eligible to be paid with forfeitures, her theory would require FJM to *breach* its fiduciary duty by violating the express terms of the Plan Document.

*Second*, the Complaint alleges that FJM failed to use forfeitures in the same year they were incurred. Compl. ¶¶ 149-50, 154. As a threshold matter, Plaintiff has pled herself out of court— she alleges that the Plan Document allows FJM to use forfeitures in the *following* year instead. *Id.* ¶ 144. Thus, the allegation that FJM did not use all forfeitures in the same year they occurred, without more, is insufficient to state a plausible imprudence claim.

Moreover, Plaintiff misses a critical detail. The Plan Document defers to the Adoption Agreement, which imposes no such requirement. Specifically, the Plan Document states that forfeitures should be used: (i) "in accordance with the [e]mployer's elections in the Adoption Agreement," [] "without limitation"; and (ii) "as of the date(s) elected in the Adoption Agreement." Ex. 8, Plan Document at 75 (Section 9.12). The Adoption Agreement, in turn, addresses the timing of forfeiture use but does not include the same-year deadline that Plaintiff seeks to impose on FJM.[20]

---

in the Plan's Form 5500s for compensation received by the Plan's recordkeeper and investment consultant. *See* Exs. 1-5, 2020-2024 Plan Form 5500s at 4.

[19] Notably, the Plan Document explicitly identifies recordkeeping fees as an example of an expense that must be borne by Plan participants. Ex. 8, Plan Document at 105.

[20] Nor does ERISA (or any of its rules or regulations) impose any such time limit. *See EEOC v. Abercrombie & Fitch Stores, Inc.*, 575 U.S. 768, 774 (2015) (explaining that a statute's silence should be construed "as exactly that: silence").

Ex. 9, Adoption Agreement at 52 (Section IX.E.). The fact that there were unused forfeitures during the proposed class period, standing alone, is therefore insufficient to state an imprudence claim.

In sum, Plaintiff's forfeiture claim should be dismissed. The Complaint does not plausibly allege that there were qualifying Plan expenses that could have been paid with forfeitures but were not, or that FJM was required to use forfeitures in the year in which they arose.

## CONCLUSION

For these reasons, the Court should dismiss Plaintiff's claims in full with prejudice.


Date: June 29, 2026.                    Respectfully submitted,

                                        GROOM LAW GROUP, CHARTERED

                                        William J. Delany (*Pro Hac Vice*)
                                        David N. Levine (*Pro Hac Vice*)
                                        Larry M. Blocho Jr. (*Pro Hac Vice*)

                                        KIRTON MCCONKIE

                                        */s/ Jacob A. Green*
                                        Jacob A. Green
                                        Annemarie H. Garrett

                                        *Counsel for Defendant FJ Management Inc.*

25

## WORD COUNT CERTIFICATION

I hereby certify that the forgoing document contains 7,749 words and complies with DU-CivR 7-1(a)(4).

/s/ Jacob A. Green
Jacob A. Green

## CERTIFICATE OF SERVICE

I hereby certify that on June 29, 2026, I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system, which shall send notification of such filing to all parties of record.

/s/ Jacob A. Green
Jacob A. Green